IN RE DISBARMENT PROCEEDINGS against HENRY S. CONRAD.—105 S. W. (2d) 1.

Court en Banc, February 3, 1937.

*Roy McKittrick*, Attorney General, and *Franklin E. Reagan*, Assistant Attorney General, for informants; *Boyle G. Clark*, *J. D. James*, *John C. Grover*, *Grover C. Sibley* and *James A. Parks* members of the Advisory Committee.

584

*Cyrus Crane, W. T. Ragland, L. E. Durham* and *Hale Houts* for respondent.

HAYS, J.—Original proceeding brought upon information filed on June 2, 1936, by the General Chairman of Bar Committees of Missouri and the acting members of the Advisory Committee of the Sixteenth Judicial Circuit, in accordance with Section 13 of this court's Rule 36, to suspend or disbar Henry S. Conrad, the respondent, a duly licensed and practicing attorney at law, now and for many years residing and maintaining a law office in Kansas City, Missouri.

The information involves respondent's representation of the owners of property in the city block which is the site of the Jackson County courthouse recently constructed in Kansas City. The county selected the site and took options to purchase the property for sums totaling $1,010,000. Shortly thereafter the McCoy Land Company, a corporation, owning a block of ground across the street from the old courthouse, and represented by the law firm of Scarritt, Jones & North, brought a taxpayer's suit against the members of the county court to enjoin the issuance and negotiation of bonds for the site. The county's counsel resisted the suit, succeeded in having a demurrer sustained to the original petition and a motion sustained to strike out parts of an amended petition. The suit remained pending in the circuit court, however, with the prospect of appeal in the event of a final judgment for the county in the circuit court.

.The McCoy Land Company suit thus threatened the property owners with the loss of the prospective sale of the property for $1,010,000, and caused an exodus of tenants and consequent loss of rents from some of the properties.

Early in 1932 the property owners organized for the purpose of taking steps to get the taxpayer's suit out of the way and in February, 1932, acting collectively, employed respondent to represent them.

Respondent's original employment was for the purpose of investigating authorities and presenting them and arguments to the firm of Scarritt, Jones & North, as attorneys for the McCoy Land Company and W. C. Scarritt, the head of the firm, for the purpose of persuading them that if their taxpayer's suit was not well founded, the company, and possibly the attorneys also, would be liable for damages to the property owners for maintaining the suit; to threaten to bring a suit for damages, and if such persuasion and threats failed, to actually bring a premature suit for damages and take depositions to develop facts in respect to the basis of the taxpayer's suit and the motive back of it. For such service the property owners collectively agreed to pay respondent a fee of $1000 and to advance the sum of $250 for expenses of such a suit.

Respondent proceeded to carry out his agreement. He held numerous conferences with Mr. Scarritt and his firm, submitted authorities, made arguments and threatened suit, but became convinced that Mr. Scarritt and his firm could not be so induced to voluntarily dismiss the taxpayer's suit, and that the only hope of disposing of it and of saving the sale of the property of the taxpayers and avoiding other dire results to them, was to effect some monetary settlement with the McCoy Land Company.

He suggested some such settlement to Mr. Scarritt, who shortly after made an offer to settle and dismiss the suit for $100,000, one-half to be paid to the McCoy Land Company and one-half to the county. Upon respondent's refusal to consider or report that offer after several subsequent conferences, Mr. Scarritt reduced his offer to $50,000 to be paid the McCoy Company, which offer respondent reported to the property owners and which they refused. Thereupon they authorized respondent to make a counter offer of $25,000, which he did, and to negotiate with Mr. Scarritt for a money settlement. Respondent by further negotiations and conferences succeeded in obtaining from the counsel an ultimate offer to settle for $35,350, being three and one-half per cent of the total purchase price of the courthouse site under the county's options. The respondent so reported to the property owners immediately and they authorized him to make a settlement for that sum, if necessary. Respondent negotiated a settlement on that basis which was later consummated by the payment of that amount to the McCoy Land Company out of the proceeds of the sale of the property, charged *pro rata* against the various property owners. The charge contained in the information is founded upon this settlement.

The information charges that at the time the respondent submitted to the property owners the proposition of the McCoy Land Company to dismiss the injunction suit for that sum he asked the property owners present if it would be all right if he could get the McCoy Land Company, W. C. Scarritt and the Scarritt firm to pay him something additional on his fee; that all the property owners did not hear this statement; and that at said time neither the property owners nor the respondent had any idea that the land company, or its counsel, would pay the sum of $5000 or any sum, and the suggestion of the respondent was not taken seriously by them. Some of the property owners expressed approval of the suggestion of the respondent, and some said nothing, because they considered the remarks of the respondent as of no consequence, and others did not know of the suggestion made by him. No one offered any objections.

In response to the averments above, respondent pleaded that at the time he submitted to the property owners, and they authorized him to accept, the said proposed settlement he proposed and asked

authority to obtain from the land company an agreement to pay him *an additional fee* for his services rendered the property owners *out of the settlement authorized,* if possible, and averred that in so making said proposal he pointed out to the property owners that the initial fee did not cover his services in making the monetary settlement *and that the property owners would be relieved to the extent of payment of his fee from the McCoy Land Company.* The answer denied, upon information and belief, the remainder of said averments, and pleaded that by reason of what transpired respondent believed at the time and still believes that he was authorized in making the settlement with the land company for $35,350 to obtain an agreement from it to pay him a reasonable fee; that by reason of what transpired he was in fact so authorized, and that the sum of $5000 was a reasonable fee for his services for negotiating and consummating the monetary settlement.

Respondent's testimony was definitely to the effect that his initial employment was arranged and agreed upon by Howard Huselton and Col. Rubey—not together, but separately—on behalf of the property owners and not at a property owners' meeting. In that respect the testimony of Huselton and Rubey is in direct conflict with that of respondent. Mr. Huselton and Col. Rubey attended all the meetings of the property owners and were active throughout the affair. Mr. Huselton had organized the property owners, and most of the meetings were held in his office. Col. Rubey was elected permanent chairman and acted as such after the first meeting, Mr. Huselton presiding at the first. Mr. Huselton got the property owners together in the initial meeting "to tell them what was going on." In that meeting, or in another held shortly thereafter, suggestion was made that the property owners employ legal counsel and they decided to do so. In response to inquiry made of Huselton he mentioned respondent, who was his attorney and was well known to perhaps most of the property owners. (We quote) "So they decided to call Mr. Conrad into the meeting if he would come. I am in the same building and I telephoned Mr. Conrad and after a little delay he came down, . . . and they began asking Mr. Conrad questions, and I recall that the thought in my mind was this, that possibly there would be some law whereby this suit could not be maintained on the part of the McCoy Land Company and that if we, on account of the legal delays lost the sale of the property to the county court . . ., that we could find reason for a claim for damages against Mr. Scarritt personally and the McCoy Land Company as a corporation. So they asked Mr. Conrad if he was free to advise them in the premises. He said he saw no reason why he should not and they asked him if he would be willing to go into the entire situation along the lines I have just suggested and ascertain whether in his judgment the property

owners would be justified in undertaking an action of that sort and whether he thought it could be maintained.'' He answered the following questions thus: ''Q. Now, up to that time that Mr. Conrad was called down into that meeting, had he ever been consulted so far as you know? A. No. Q. About representing those property owners? A. Not that I know of. Q. Had you talked with him about it? A. Had I? Q. Yes. A. I may have, because Mr. Conrad is my attorney. I may have, because it was a serious matter.''

Col. Rubey testified that he, regarding the McCoy case as a hold-up suit, himself suggested the employment of counsel; that he made this suggestion at the first, the organization meeting; that Mr. Huselton who had recommended Mr. Conrad, then went to Conrad's office and brought him before the meeting; that Mr. Conrad there stated to the property owners the terms upon which he would accept employment and the scope and purpose thereof (the same as stated by Huselton); that the property owners then and there agreed to the same. To the question, ''Did you discuss the matter with Mr. Conrad personally?'' the witness replied: ''Never, except in the presence of the committee'' (property owners).

It appears that hard on the filing of the McCoy Company's suit editorials had appeared in the Kansas City Star which implied, if they did not assert, that the McCoy Company's suit was brought for sinister ends and that the motives of the company's counsel were at least unworthy. The articles verged upon libel, it is said, and it appears the counsel were smarting from the effects of the aspersions contained in the articles. It appears from the testimony of Mr. Jones that his firm had expected that other taxpaying property owners in the city and similarly interested would become parties to the suit by intervention, as they could have done, and share in paying the fees of said firm, or at all events lend to the suit their active interest and influence. Their expectations and hopes in that respect were not fulfilled and the suit remained that of the company alone. It is to be noted, however, that respondent was not then apprised of such expectations so far as the record affirmatively shows.

Respondent testified in effect, that an investigation into or a determination of the merits of the McCoy suit was not within the scope of his employment; that in his efforts to convince Mr. Scarritt he did not go into the merits of that suit; and that he limited his investigation to going over the pleadings and briefing the law upon the question of damages, he having in mind whether or not, after such briefing of the law, a suit could be brought which would not be premature as to the prosecution of the action for damages to a finality, and also having in mind that he could, nevertheless, bring suit and take testimony. Respondent before briefing the authorities had in several conferences held with Mr. Scarritt failed to convince

him by arguments and threats, so the brief referred to above was employed to buttress the arguments and threats which he continued from time to time to make to Mr. Scarritt, though without avail. Respondent further testified that he had no idea that he could make any progress with Mr. Scarritt by trying to convince him that the McCoy Land Company suit was without merit as that matter had already been thrashed out on demurrer in court at Independence on argument by lawyers who had prepared on it, and also on demurrer which had been argued in the Kansas City division of court, upon the sole issue. He said, and the record in the Kansas City division discloses, that a demurrer to the McCoy petition was sustained in the Kansas City division; and amended petition was filed; motion to strike parts of it was filed March 18, 1932, and sustained, expurgating the amended pleading so Mr. North testified. Those conferences, and communications by letters continued to perhaps March the first. The Scarritt firm, he said remained adamant against dropping the suit. About that date Mr. Groves, a real estate agent and director of the McCoy Land Company, made threats of foreclosing the mortgage—held or controlled by him—existing on the property of Mrs. E. C. White. The property was optioned at $70,000 and the mortgage was for $24,000, reduced from $27,000. Shortly learning of the threatened foreclosure and that all but the larger properties were in like dangerous situation, respondent in view of the long period through which an appeal in the McCoy suit would run, reached the conclusion that the only solution of the situation was settlement on a money basis. Then it was he took that matter up with Mr. Scarritt as stated above.

We come now to the decisive question in the case, namely, the making of the compromise in the manner in which it was made and the question of the authorization of the $5000 fee.

Upon Mr. Scarritt's making the $50,000 offer, respondent called the property owners in meeting at his office and submitted the same to them. After considerable discussion of that offer among the property owners, which was the first and only offer that respondent had submitted to them, they declined it and by consensus of opinion authorized respondent to make an offer to get rid of the suit by paying $25,000. When the meeting ended he went back to Mr. Scarritt and associates and told them of the meeting and of the refusal of the $50,000 offer and of his belief that he could settle it by paying $25,000. The Scarritt firm would not consider that sum, but after further discussion and some suggestion of an intermediate sum, Mr. Scarritt declared his ultimatum to be three and one-half per cent, or $35,350, of the optioned value. Respondent so testified, and further testified as follows: So he went back and called the lot owners together again and submitted to them that ultimate offer. It was dis-

cussed among them. Motion was made and carried without dissent to accept it. He had told Huselton of the $100,000 offer but did not (so he testified) intend for him to tell the property owners. We now quote, but in narrative form, respondent's testimony on the vital issue as follows:

"Now, after they voted for the 3½%, I said to the property owners in substance this: I said, 'Now, I have been working here a great deal, and you know, continuously, upon this matter that we now have and it is outside of my employment, and I am entitled to be paid for it, and yet, if I can't do any better, if I can get Mr. Scarritt to allow me a fee, as a result I won't have to call on you people.' Mrs. White spoke up and says, 'I wish you could get all of it.' Another property owner over here, I do not recall who it was said, 'Well,'—in substance it was—'You will never get anything out of that tightwad.' And then they had talk among themselves, just among themselves, and there was considerable laughing about it, but the laugh and anything of that kind didn't come from any lack of seriousness on my part. That was a serious proposition which I had made, thinking I saw, maybe, as a last resort, of probably saving these property owners something. It came, as I gathered, from the idea—'Well, it is ridiculous to think that Mr. Scarritt will allow you anything.' But not a soul made any objection. . . . At the time the property owners and I had this conversation where they consented that I should get a fee from Mr. Scarritt if I could, no fee matter had ever been mentioned in Mr. Scarritt's office. I did not tell the property owners at that time that if I couldn't collect from Mr. Scarritt what I was going to charge them. . . . I told them I was entitled to an additional compensation and possibly I could get a fee from Mr. Scarritt. I didn't even tell them if I got a fee from Mr. Scarritt that it would settle my claim against them. I didn't tell them that even. . . . What was said about getting a fee out of Scarritt or his company occurred before the meeting broke up. . . . The meeting was still in session, and so far as I know, every property owner was there. . . . *I saw that if Mr. Scarritt was going to stand upon that as an ultimatum that possibly 'I could edge that in, and I had it in mind for the purpose when I presented it to the property owners that they would be saving just to that extent if I could do it.* In my opinion that idea rose in my mind while we were in the room." Respondent said his memory was clear when giving his testimony, and throughout had been, and was then absolutely clear that the question of Scarritt's paying him a fee and giving his ultimatum did not occur at the same time or on the same day. "As I have viewed it now I have never had any doubt about it . . . I will say this so that there will be no mistake about it, that the fee had never been mentioned prior to the time the property owners au-

thorized this 3½%; it had never been mentioned." The fact that respondent made no recommendation to the property owners relative to their acceptance or rejection of the same, but left that matter to their own decision, is not disputed, nor is the fact that he did not thereafter seek or receive any further fee from the lot owners, hence all other evidence in relation thereto will be omitted.

W. F. Tierney, representing the Shawnee Realty Company, made affidavit to the Bar Committee to the effect that he attended the numerous meetings and was present on the occasion when respondent reported Mr. Scarritt's ultimatum. The affidavit coincides with Mr. Conrad's statement, supra, made to the lot owners concerning fee and consent, also as to absence of objection. Later (when is not indicated) affiant learned respondent was paid a fee by the McCoy Land Company and affiant had no objection to it.

Property owners, Col. Rubey, Mr. Dennis, Mr. Neel, Mr. Waddill, Cora Belle Neevel, Mrs. Dora Franke, Mrs. Bennett, Mrs. Jacoby and Mrs. White, testified in substance that the remark of the respondent with respect to obtaining a fee from Mr. Scarritt, or the McCoy Land Company was regarded as facetious and was not seriously taken by them and that they received no impression a fee was to come out of the money they were paying the McCoy Company in settlement, and that they did not learn of the payment until the matter came out on the trial of an action later brought by Mrs. White against Mr. Scarritt and the McCoy Land Company. Some of them testified that the remark was made at or about the time the meeting broke up and some of the participants had left. Mrs. White instituted suit against the McCoy Land Company to recover the sum she paid as her share in the settlement of the McCoy Company's suit, predicating the action on "extortion, coercion and duress and violation of public policy." She recovered judgment which was affirmed by the Kansas City Court of Appeals. [White v. McCoy Land Co., 229 Mo. App. 1019, 87 S. W. (2d) 672, Oct. 7, 1935.]

Shortly after the last meeting mentioned above the respondent called upon the Scarritt firm and reported to the members that he could get the property owners to accept the offer of $35,350 provided they would take care of a fee for him in the matter, he saying he thought he should have a substantial fee but not mentioning any sum. (We quote): "Then they told me to leave the room and I went out of Mr. Scarritt's office, left the three members of the firm in the office and went into Mr. Jones' room. I do not know how long they were in there in conference, but when they came back they said, 'Well, we have discussed the offer and we can allow you a $5000 fee' and I said 'That is all right.' That is all that ever was said in that office on the question of a fee." After that he said to Mr. Huselton "I have made an arrangement about this matter and Mr. Scarritt

is going to pay my fee. There will be no charge against the lot owners." That settlement was agreed upon on April 9, and respondent was requested by Mr. Scarritt to prepare the contract. This he later did, and after the execution of the contract by the McCoy Land Company the property owners dropped into Mr. Huselton's office and signed it.

The contract made no reference to respondent's fee, or to the amount of it, or by whom it was to be paid, but provided that the entire sum, $35,350, was to be paid to the McCoy Land Company out of the proceeds of the sale of the several properties to the county. The contract was deposited in escrow with the title company through which the details incident to closing the sale were to be carried out. The account books in respondent's law office show the debits and credits incident to the $1000 fee and expenses on one ledger sheet headed "Oak Street Improvement (Court house site)." The $5000-fee transaction appears on a separate individual ledger sheet under the caption "McCoy Land Company." The debit is "To services in the matter of court house site controversy with McCoy Land Co." and the credit is noted as "paid by McCoy Land Co. with consent of the owners of court house site." Spurgeon L. Smithson was an attorney practicing law in Kansas City with respondent until the summer of 1933, during which time he and other members of the firm had drawing accounts and periodically divided the net profits. Smithson testified that he never heard of the $5000 fee until he read about the matter in the paper at the time of the White trial, but other members of the firm, Mr. Durham and Mr. Hale Houts, testified that at the time of the receipt of the fee they were advised of it.

In the White case, mentioned, supra, which was tried in February, 1934, approximately two years after the fee transaction, the respondent was a witness and ·in his examination it was developed that he received from the McCoy Land Company the $5000 fee herein referred to. The respondent sought the judge presiding and explained that as a matter of personal privilege he would like to give further testimony on that subject. That privilege was granted, and a question was asked and an answer given as follows: "You didn't tell Mrs. White that Mr. Scarritt paid you $5000? A. I do not remember of telling Mrs. White any sum but I told all of them that Mr. Scarritt had agreed—or the Land Company—to take care of the fee and that therefore there would be no charge made." Looking back upon the matter, he testified before the Bar Committee: "I testified to the conclusion rather than the fact on which the conclusion was based. I should have said that I told Mr. Huselton, who was representing in all these legal negotiations these property owners."

During the evening after respondent gave his first testimony in the White case Mr. Rucker, counsel for the plaintiff in that case,

called the property owners constituting the last group above mentioned, and also Mr. Huselton, and they, including Mr. Huselton, in answer to his question, each and all responded that they had no previous knowldege that respondent had received a $5000 fee from the McCoy Company. However, Mr. Huselton in giving his testimony in the present proceeding testified that until respondent told him of his testimony in the White case he had no knowledge that respondent had received a fee or how much it was but that he did know he was to get the remainder of his fee from the McCoy Company, and that he considered that a personal matter and asked no questions.

The testimony in respondent's behalf given by leading and distinguished lawyers tends to show that the charge of $5000 for effecting the compromise was extremely moderate. On the other hand, the position of the Attorney General as stated in his brief is, in substance this: If respondent had succeeded in getting the injunction suit dismissed at the end of his efforts directed to that end he would have performed the services contracted for. His persuasion, backed only by authorities and his damage-suit threat, failed, but when the property owners added $35,350 his persuasion took effect and the injunction suit was dismissed. In other words, if he had succeeded in getting the injunction suit dismissed *without cost to his clients* when his fee was $1000; but if he succeeded in getting the injunction suit dismissed at a cost of $35,350 the fee should be increased by $5000.

On April 25, 1936, in obedience to formal notice, respondent appeared and testified before the Advisory Committee. A month later he made refunds to some of the property owners as follows: Mrs. White $217; Dora Franke and Mary Jacoby $100; Mr. Silverstone $100; Mrs. Neevel $201.50; Mr. Bennett $186 and Ellison Neel $112.50. Shortly thereafter he made offers to the McBride Realty Company to refund, which will be detailed presently.

Those who received refunds (other than Mr. Neel) executed to respondent receipts in stereotyped form (we omit the sums recited), e. g.: "Received of H. S. Conrad $——— in Court House site transaction. I now acknowledge myself entirely satisfied with the fee received by Mr. Conrad in that matter." Some of them were signed by the recipients through their attorney, Mr. Rucker; Mrs. White *per se*. Mr. Neel's name was subscribed by him to an unsigned note, initialed "H.S.C." and presumably sent him by respondent, as follows: "Ellison: Only recently did I have an opportunity to read your testimony in the court house matter. As a result I am enclosing herewith my check of even date, payable to you in the sum of $112.50. Yours truly, ———————."

These receipts were presented to the Advisory Committee on May 27, 1936, at Chillicothe, Missouri, by one of respondent's counsel,

Mr. Cyrus Crane, former president of the Missouri Bar, who on that occasion offered himself and testified as a witness for the respondent. Among other things, he said in substance, Mr. Conrad, after he was served with notice to appear before the committee, told him that he wanted him and Mr. Durham to act as his friends and advisers in the matter and requested that they first get the testimony from the committee which had been taken in their preliminary investigation. A day or two after that Mr. Conrad and Mr. Durham called upon Mr. Crane and Conrad told him that he had read the testimony and stated that, regardless of their advice, it was his first idea to sit down and send them back a check; he had a form letter ready to send them and whether rightly or wrongly "we persuaded him out of it and told him to go before the committee and make the facts clear and plain." Later Mr. Conrad said to his counsel, "I think I am going to talk with these people and find out how they feel about it and what their idea is," and, as Mr. Crane explained, that is what he proceeded to do.

Subsequently, on June 24, 1936, further hearing was had before the committee, Mr. Crane being present as respondent's counsel and Col. Rubey being called as a witness. The witness was interrogated as to whether or not, after the matter of the investigation had become known, Mr. Conrad came to him and had a conversation with him relative to paying back or restoring any money that had been paid by him as one of the property owners and particularly the expense money. The testimony of the witness was in substance as follows: Mr. Conrad came to see him, and offered to write a check for his proportionate part of the $250, which was about $83, and stated he would like to have a talk with him and Mr. Dennis, who was an officer of the McBride Realty Company, and who also represented certain persons interested in the property. At Col. Rubey's suggestion an appointment was made for the following day, and he talked with Mr. Dennis later in the evening. The next morning he asked Rubey if he had talked with Mr. Dennis, Rubey said he had. The next inquiry was as to the outcome of that talk. Rubey reported that he thought, in order to clear up the situation, the $5000 fee should be returned to the people who contributed it. Mr. Conrad's reply was that no one had asked him to do that. Mr. Conrad left but later in the day returned and had a talk with both Dennis and Rubey. Asked what occurred at that time, Rubey answered: "Mainly what had happened before;" they told him they thought they were entitled to their proportionate share of the $5000 and of the $250 expense money, which was approximately $1535. Mr. Conrad said, "I will see you people again in a few days." In May Mr. Neel came to Rubey's office and stated that he had received a check from Mr. Conrad. Later on in the day Rubey 'phoned Mr. Conrad telling

him of Neel's being in with a check, and asked him if he had a check for the McBride Realty Company; Conrad replied he had sent Neel a check because he was an attorney and needed no one to represent him. Conrad then said: "I will see you shortly." Mr. Conrad did·not see or communicate with Rubey after that. Conrad had first called upon Rubey at his apartment when he was indisposed and in bed. Conrad said he had come to talk about the refund of the expense money; but they had practically no talk; he told Conrad he would see him down at the office.

Col. Rubey emphatically denied that he at any time had had conversation with Mr. Conrad in which he told him that he did not owe them anything or should not repay any part of the $5000 fee; or that he (Conrad) was entitled to additional compensation; or that ·he (Rubey) was perfectly satisfied. He said that Mr. Conrad implied he wanted to make a settlement. No statement asking Conrad for the amount due the McBride Realty Company was sent by either Col. Rubey or the McBride Realty Company, such a statement had been prepared, however; he said he did not make any statement that he did not think Conrad should pay any part of it.

Mr. Dennis testified that Mr. Conrad on the occasion of his visit at Col. Rubey's office stated that he wanted the good will of both Rubey and Dennis. Mr. Dennis had tried to remain out of this proceeding because of his friendship with Mr. Conrad's son. After much conversation relative to what would be right in the matter Mr. Dennis told Mr. Conrad that he felt the same as Col. Rubey did, that he thought he (Conrad) should return the $5000 fee and that they should have their proportionate share plus their share of the expense money. Mr. Conrad then said he did not think that quite fair, that he would be willing to pay something but that they must understand he was entitled to a fee for his settlement (We quote): "We did not agree to this at all; and so then he suggested that he pay us back part of our proportionate share of the $1000 attorney fee, and I said, 'Well, why that?' I said, 'Do you mean that you are willing to give us back our proportionate share of the $1,000 and the proportionate share of the $250, but you won't be willing to pay us back our proportionate share of the $5000 that you received from Mr. Scarritt?' and he said—then he went on at great length that that wasn't exactly it, and that he wasn't closing the door, and that he would be back to see us again, but he thought that we were entitled to something; and I said I didn't think it was a trading proposition at all, that I really thought since he had asked us what we thought, that that was my opinion." Mr. Dennis testified that never in his presence did Col. Rubey tell Mr. Conrad "I do not want you to pay anything . . . I am perfectly satisfied." His testimony corroborated that of Col. Rubey in other respects also.

With respect to his dealing with Rubey and Dennis, Mr. Conrad testified in substance as follows: When he called at Rubey's apartment he found him in bed; Rubey, he said, had no complaint about the Scarritt fee, but thought that probably Conrad ought to pay back the expense money; Conrad said he had received only a small sum over the $1000. Rubey then said, "You don't owe me anything then." Conrad replied that he knew he didn't but he wanted to keep the good will of his clients; Rubey's next reply was: "No, you don't owe me anything, and as far as good will you have got it;" he then reached over and shook Conrad's hand. Mr. Conrad suggested that Rubey talk with Dennis and he would talk to both of them the next day. He later called on Rubey; Dennis was not there; at that time he reminded Rubey of their previous talk and estimated Rubey's share of the expense money to be about $82. He offered to write a check for that amount but Rubey said he wanted to talk with Dennis, that he would be in after a while. Either Rubey or Dennis shortly after called Conrad, who immediately went over to their office and talked with both of them, stating to Dennis that Rubey thought Conrad should repay the expense money. Dennis took the position they should be repaid both the expense money and the Scarritt fee. Conrad called his attention to Col. Rubey's testimony that the services Conrad had rendered in the compromise settlement were not in the original contract. Conrad asseverated, as he had in settling with the others, that he did not owe the property owners a cent, but was endeavoring to satisfy his clients so there would be no question about any fee he had ever gotten. He told them to think over the matter and he would call again. He testified also that previous to that occasion he (Conrad), after reading testimony given by Rubey at one of the earlier hearings and in reference to the same, had thanked him and said: ". . . but upon the substantial facts as given, you have done a mighty good job in an effort to tell them as they are." He further testified that Mr. Rubey replied: "I wanted to do that, and I want to say to you now that I don't want you to have any trouble before that committee, and I want you to come right out of there without any trouble."

The conference with Col. Rubey and Dennis above referred to was the last personal conference he had with either of them. Mr. Conrad testified also that Col. Rubey 'phoned him of Neel's being in his office with a check and asked Mr. Conrad if he had a check for the McBride Realty Company; Mr. Conrad made the same statement as to why Neel had received the check that Col. Rubey made in his testimony.

The foregoing has painstakingly and very laboriously been gleaned from a scattering record covering several hundred pages of the stenographer's typewritten transcription of notes taken in the vari-

ous sittings of the committee in the hearings had before the members thereof. The committee's record, exhibits, etc.—in fact all evidence whatsoever before the committee—were by the parties herein, through stipulation filed, submitted in this court as and for the record in this proceeding. So far as we have been able to discern each side, throughout the committee hearings, extended to the other all due courtesy and consideration. The respondent testified with unrestricted latitude and at great length; his testimony alone runs through some one hundred and thirty-odd typewritten pages. ██ In this court the informants were represented by the Attorney General's department, and properly so according to custom in this State and because the proceeding is obviously affected with a highly important public interest, "for the proceeding is not for the purpose of punishment, but for the purpose of preserving the courts of justice from the official ministrations of persons unfit to practice in them." [Ex Parte Wall, 107 U. S. 265, 2 Sup. Ct. 569, 588, 27 L. Ed. 552; In re Sparrow, 338 Mo. 203, 90 S. W. (2d) 401; In re Burns (Idaho Sup. Ct.), 40 Pac. (2d) 1. c. 107, and cases there cited.] ██ The respondent, himself a lawyer of distinction, was in the committee hearings and in this court is represented by counsel of generally recognized leadership at the bar of this State. The Advisory Committee, on their own initiative and in their official capacity have, by their investigation and by their institution of this proceeding, rendered self-sacrificing and wholly gratuitous service in the discharge of their duty in the premises as they saw it. The record, as we read it, contains no implications that might lead us to believe that they acted in the premises arbitrarily or without reasonable cause, as intimated in respondent's brief, and hence we think the usual presumption of proper official action may properly be indulged here. It remains for this court to determine whether the truth of the charge which the committee have preferred has been established.

Circumstances additional to those shown above may appear in passing and properly, with the other facts noted, may be for our consideration in determining the case upon the weight of the evidence, which it now becomes our duty to do.

The basis of the charge as laid in the information is that respondent by his alleged conduct relative to the $5000 fee violated Section 38 of this court's Rule 35, which section provides: "A lawyer should accept no compensation, commissions, rebates or other advantages from others without the knowledge and consent of his client after full disclosure." This section is identical with a canon of ethics as established and promulgated by the American Bar Association some years ago and is an express adoption of the same. The respondent testified that he was a member of that body and was acquainted with this canon. In this proceeding the decisive controversial question

is upon the application to the facts of the elements "knowledge" and "consent," and "full disclosure." It seems obvious that the problem to be resolved is predominately a question of fact insofar as citation of authorities is concerned. A few general principles of rules of law will suffice for guidance, and there is need for the application of but few decisions as supporting authority. Nevertheless, we have laboriously examined each one of the great number of decisions which counsel have seen fit to cite, and have found them mostly to be purely by the way.

▮ Counsel for respondent direct attention to the rule of evidence that when the parties understand a contract differently the triers of the facts must give to the evidence of the contract a plain common sense construction. That is a long settled rule applying generally in lawsuits between the parties to the contract (Fenton v. Perkins, 3 Mo. 18), even as between principal and agent (O'Day v. Con, 313 Mo. 1. c. 377). This is not such a suit. A more exacting rule applies to dealings between attorney and client. "The relation of attorney and client is, as has been seen, one of the highest trust and confidence, requiring from the attorney the observance of the utmost good faith toward his client, and the parties have been held to sustain to each other, during the time the relation exists, in respect to any matter being conducted for the client by the attorney, the relation of trustee and *cestui que trust*, and their dealings with each other are subject to the same intendments and imputations as obtain between other trustees and beneficiaries." The client is entitled to be fully informed of his rights and interests in the subject-matter of the transaction; and of the nature and effect of the transaction itself, and to be so placed as to be able to deal with the attorney at arm's length. [2 R. C. L., p. 966.] And if an attorney seeks to secure personal advantage of his client, he is not entitled to any pay for his services. [Id., p. 1062.] These rules as quoted and stated apply to agreements for increased compensation after the confidential relation is inaugurated. Corollary to them is another, namely, "The burden is upon counsel to show that the new contract was fairly made, was reasonable, and that no advantage was taken by reason of the confidential relation existing between counsel and client" (quoted from 6 C. J. 737, and applied in Burns' case, supra, 1. c. 112).

▮ Respondent stresses the fact that in the period following the trial of the White case none of the property owners complained to him about the $5000 fee. However, the record discloses, as we have seen, that five of them, including Mrs. White, after she recovered judgment for the full amount she had contributed to the compromise settlement, proceeded through Mr. Rucker as their counsel to file suits against Mr. Scarritt and the McCoy Land Company similar to the White suit which was not decided on appeal until October 7, 1935.

Other property owners who received their first information from the trial of that case, did not, for reasons of their own, desire to go into a lawsuit. Two of these, Rubey, and Dennis, were reluctant to testify before the Bar Committee in this proceeding. Anent respondent's suggestion above, it may be stated that as a business proposition it is manifest that a recovery for the whole of the contribution made by the property owners to the settlement was better than recovery of their proportionate parts of the $5000. If the suggestion was meant to go to the interest of the property owners as witnesses, a counter suggestion is that they were not parties to this proceeding nor shown to have had anything to do with the initiation thereof, and the result would have been *nil* as to them. We see nothing in the record to indicate that the property owners were affected with any personal spite toward respondent.

Counsel for respondent go so far as to express in their brief that in their belief the facts justify the conclusion that ''no lawyer ever performed a greater service or accomplished a better result for his clients in a situation of the character here involved.'' The estimate made by counsel for the other side, so markedly different from that, has been stated above. That issue so joined is beside the case and, therefore, not for present consideration. We are concerned with the duties and responsibilities of the respondent and how they were met. We may observe, however, that the purpose and efforts to dispose of the McCoy Company suit by persuasion or by threats of reprisal or by appeals to public spirit, were at the start doomed to failure, albeit respondent was not so aware.

As it transpired his opponent had a decided advantage of position. The compensation, if any, of the Scarritt firm for their services as counsel would of necessity, as the members well know, come out of the pockets of Mr. Scarritt and his brother, for this reason: The McCoy Land Company was and for some time had been moribund, kept alive only by money transfusions administered from time to time by Mr. Scarritt and his brother by way of guaranteeing an existing mortgage, or part thereof, on its property and keeping up the interest payments thereon. Shortly after the final determination of the White case the mortgage was foreclosed and the property bought in by the beneficiary for $17,500. As the matter turned out the firm and Mr. Scarritt, personally, together received around $17,500 out of the compromise settlement for their services. In addition, they were earlier of a mind to compromise—as an investigation set on foot by Mr. Neel had developed, but without the knowledge of the respondent, — before the latter took up the matter of compromise. Mr. Neel had learned that a compromise could be made at the figures later offered respondent at the beginning of his monetary negotiations.

Mr. Scarritt had, as already stated, remained adamant against per-

suasion and threats. Mr. Scarritt testified that when respondent began his negotiations (we quote) "to get that suit out of the way, he took it up on the idea that we ought to dismiss the suit, public interest, and going ahead with public improvement, and all such stuff as that." He corroborated respondent's testimony as to subsequent conferences held at respondent's request; their exchange of briefs on the legal questions involved in the suit and those involved in respondent's contemplated action for damages; the witness saying further: "I didn't pay much attention to that. I don't recall that he did. Any action at that time would be so wholly premature and that doesn't impress me at all." After subsequent negotiations had progressed for a time Mr. Scarritt and his partners came to the conclusion they ought to get to work on the suit or do something else about it. In that regard Mr. Scarritt further testified among other things: "And so it was understood between us that we would say that if his clients desired to pay $3\frac{1}{2}\%$, which we understood was the amount that they would pay an ordinary real estate agent if he brought parties together, that we would be satisfied." They so advised the respondent. Mr. Scarritt testified that the sum of $5000 as a fee was mentioned in Mr. Conrad's presence before Mr. Scarritt and his partners retired and then came back and told him he could have that sum if it was agreeable to his clients, to which he replied: "Oh, certainly Scarritt, I understand that. . . . If I can get all this out and insure them that all my additional fees are paid, it will save me a lot of annoyance and worry."

Further examination of Mr. Scarritt follows: "The Chairman: In other words, you reached this point where you were willing to accept $35,350 or whatever it is, and Conrad said: 'All right. Now, I will get my clients to agree to that if you will pay me $5000'? A. If $5000 will go out of that fund to pay our fee, so I can say, 'This covers everything and covers all of the expenses including my fees. I want to put it that way.' Gentlemen, there can be no doubt about that. 'I want to put it to them that way. I can get it through on this basis, and that will cover all of my fees, and so on.' Why, there isn't any doubt about it. . . ." "Mr. Jones testified: I want to say that that is exactly how it happened, and then what we conferred about afterwards was as to whether or not we would accept the proposition. . . . When that was sprung before it was sudden and I hadn't thought about it. I think this is correct." [Note:—Mr. Jones had testified several weeks previous to this examination, when he explained that though he was present at the various conferences his partner, Mr. Scarritt, had charge of the suit from the beginning and he (Jones) was then of the impression that his firm had fixed the amount of Mr. Conrad's fee.]

Reverting to the duties of the respondent and how he met them:

He may be presumed to have had the same information concerning the land company's suit that the general public possessed. As a lawyer he was aware that the suit could be disposed of in only one of two ways. It is true, his employment was limited to one of them. The situation of his clients was precarious, as he knew, and would necessarily become more so with each passing day. When he came to a realization that his plan of action would not meet the exigencies, it became his duty to report the fact at once to his clients, to enable them to choose the alternative if so advised by him or some other attorney. In the entire record we discover no valid excuse for his failure to do so. He says repeatedly his clients were in a fighting mood and employed him to fight only. It appears they sought his services as counsellor; he himself laid down the terms and described the restricted scope of his employment, without dictation on their part. They were individuals and corporations of business experience, experience at least in regard to their respective and important business properties. His setting out to make a monetary settlement without disclosure to them of his purpose, authorizes an inference of an assumption on his part of the probability that they would adapt themselves to the inevitable.

We approach the parting of the ways. The respondent is a well educated man, having been graduated with the degree of Bachelor of Philosophy. The contract which he wrote in closing the compromise settlement and making provision for the payment of the agreed sum, in its entirety to the land company, and making no provision whatever for the payment of any sum to Mr. Conrad himself, appears to have been skillfully and meticulously drawn; a model in its brevity, clarity, and nicety of precision. His proposal to accept a fee from Mr. Scarritt is, to say the least, equivocal on its face; that it did mislead and was misunderstood by a large portion of the property owners that heard it, was preponderantly proved. What was it designed to do? That question will be answered by Mr. Conrad's own conduct and words. We shall merely place in juxtaposition the substance of his several expressions, as quoted above together with the context there:

Respondent by answer set up that in making the original contract he did not meet with the property owners, but made it with Rubey and Huselton. Also he so testified. Rubey and Huselton testified directly to the contrary. Huselton, before Mr. Conrad's appearance at the property owners' meeting, outlined in lawyer-like language the scope and form of the relief needed by the property owners, identical in substance and almost in wording with the proposal Mr. Conrad made to the property owners when he was by Huselton brought before them. By answer the respondent stated in substance that he made a full disclosure to his clients of the receipt of the fee from

Scarritt, and he so testified in the White case. He testified before the Bar Committee that he reported to Huselton. Huselton, as the record shows, had no recollection of it if ever he had any information in regard to it. The lack of mention of the fee in the settlement contract and of any obligation made in writing concerning it has been noted.

Respondent set up by answer that he asked of the property owners authority ''to obtain from the company an agreement to pay me an additional fee *out of the settlement authorized*, if possible and that *I pointed out that they would be relieved to the extent of payment of my fee from the McCoy Land Company*.'' In his testimony he asserted that when he reported to his clients Mr. Scarritt's ultimatum, the idea then first arose in his mind, and he conceived the proposal, that possibly he ''could edge that in when I presented it to the property owners *that they would be saving just to that extent* if I could do it.'' (Repetition of his testimony as to the mode in which this fee was arranged for will be recalled by the reader and will be omitted here. So also with regard to testimony of Messrs. Scarritt and Jones contradictory of respondent's as to the mode. This latter will be found close above.)

Respondent's proposal, according to his latest version, was substantially: ''This matter we have here is outside my employment and I am entitled to be paid for it, and yet, if I can't do any better, if I can get Mr. Scarritt to allow me a fee, as a result—I wont have to call on you people.'' Is it any wonder that the proposal was not by the hearers understood as meaning that they would in reality pay the fee through Mr. Scarritt as an intermediary and of such size as he might see fit to make it, and they would be deprived of considering whether or not they owed the respondent any further fee under all the circumstances (some of them felt that they did not) and if so would be deprived of considering or any say as to the amount of additional fee? The purpose, which he conceived at the time, of wholly saving them from paying any further fee and which he said he purposed to point out to them then and there, and which he at some time expressed to Messrs. Scarritt and Jones, was thwarted by his oblique expression and by his indirect, hidden and concealed course in performance. As it appears, the knowledge thus imparted by respondent was not knowledge in the sense of the canon of ethics and the rules of law supra nor was the consent he obtained consent in the sense of a meeting of minds upon a common understanding, as contemplated by the rules of law hereinabove announced as applicable; the clients were not so placed as to deal with the attorney at arm's length—they were not fully advised of what lay in the back of his mind. The weight of the evidence is that the attorney sought to secure, and did secure a

personal advantage over his clients in the confidential and professional relation which he sustained to them.

The restitution made by respondent through compromising his differences with his clients, in the circumstances of the case, is without influence on the merits of this proceeding, since the theory of the law is that disbarment proceedings are not for the purpose of redressing the wrongs done the injured person nor for the punishment of the delinquent attorney, and since no inference adverse to the respondent should in this case be drawn from the fact of restitution. However, we reserve the discretionary right to consider in another connection, as we shall, that restitution has been made.

In the foregoing considerations we have proceeded with awareness that the power which is inherent in the courts to disbar should be exercised in all instances with great care; that this power is not an arbitrary or despotic one; but that where an attorney's professional misconduct is shown, the court should not hesitate to disbar or to take other disciplinary action, be the attorney of whatsoever station in life or of whatsoever standing at the bar. The judicial attitude is and should be that expressed in the classic phrase, *"Tros Tyriusque mihi nullo discrimine agetur."*

By the greater weight of the evidence and under the principles we have announced we are impelled to the conclusion that the respondent violated his legal and ethical duty to his clients as their attorney and hence became guilty of professional misconduct as charged in the information. Accordingly it will be the order and judgment of the court that the license of respondent, Henry S. Conrad, to practice law in the State of Missouri, shall be suspended for a period of four months from the effective date of the judgment herein and until payment has been made of the costs of this proceeding. All concur, except *Leedy* and *Collet, JJ.,* not sitting.