WHARTON, JR. *v.* FIDELITY-BALTIMORE
NATIONAL BANK ET AL.

[No. 133, September Term, 1959.]

*Decided March 28, 1960.*

The cause was argued before HENDERSON, HAMMOND, PRESCOTT and HORNEY, JJ., and NILES, Chief Judge of the Supreme Bench of Baltimore City, specially assigned.

*H. Vernon Eney* and *Robert M. Thomas,* with whom were *David C. Green, Russell R. Reno, Jr.,* and *Venable, Baetjer & Howard* on the brief, for appellant.

*Clarence W. Miles,* with whom were *H. Donald Schwaab* and *Robert L. Karwacki* on the brief, for The Martin Company, one of the appellees.

Submitted on brief by *Frank B. Ober* and *Robert Stinson* for Fidelity-Baltimore National Bank, the other appellee.

NILES, Chief Judge of the Supreme Bench of Baltimore City, by special assignment, delivered the opinion of the Court.

The question presented in this case is whether a director of a corporation is an "employee" of, or "employed" by, or in

the "employment" of the corporation. The case arises upon the interpretation of a restricted stock option agreement and related documents, under the terms of which the option is not exercisable until the holder "has been employed" by the corporation for a period of forty-eight months.[1]

The principal facts are not in dispute, and the solution of the question depends upon the interpretation of various documents, in the light of the corporate situation existing at the time of their drafting and acceptance. In a long and thorough opinion in the court below, Judge Warnken made full findings of fact, which we accept as setting forth the situation accurately. The case involves one of a series of options to purchase stock granted by the Glenn L. Martin Company to the appellant, Mr. J. Bradford Wharton, Jr. The corporate name of the appellee has been changed to The Martin Company, and we will refer to it in this opinion as either "Martin" or "the Company," and to Mr. Wharton as "Wharton."

In 1951 the Company was in financial straits, and it was the opinion of all concerned that new management was required in order to rehabilitate its financial structure and to save the Company from bankruptcy. Under the chairmanship of Mr. Howard Bruce, who was both a director and a stockholder, it was determined to invite Mr. George Bunker, to whom we will refer as "Bunker," to be president, and Wharton to be "vice president—finance" in order to take control of the management. Both Bunker and Wharton had been associated in the operation of the Trailmobile Company, which under them had been successful; and it was necessary to offer substantial inducements to both in order to obtain their acceptance of positions at the Martin Company. Bunker was offered a salary of $75,000. a year and a series of options to purchase 70,000 shares of common stock; Wharton was offered a salary of $45,000. and a series of options to purchase 25,000 shares of common stock. The salaries were the same as those which Bunker and Wharton had been receiving from the Trailmobile Company. In each case the time of exercise of the options was spread over a period of five years. The

---

1. For emphasis we have italicized these words in certain places and also the word "participate."

option in the case at bar was not exercisable until Wharton had been employed for forty-eight months by the Martin Company.

Bunker and Wharton assumed their duties at the Company as of February 21, 1952. Under their management the Company prospered; a net loss of $22,178,434 suffered in 1951 was changed into a profit of $5,808,312 for 1952; and by 1954 the Company books showed a profit of $20,052,315. Bunker was both president and director from the beginning. Wharton was elected as a director on May 15, 1953, in addition to his office as vice president—finance. On May 16, 1952, i.e., shortly after Wharton was elected vice president—finance, the board of directors by resolution fixed their compensation at $100. per meeting. This amount was increased on June 22, 1953, to $250. per meeting. On June 2, 1954, in a proxy statement the stockholders were informed that a proposed charter amendment would authorize "reasonable compensation" to the directors, and that the management intended to recommend a payment of $5,000. per annum "to each director who is not otherwise regularly compensated by the Company." The amendment was adopted by the stockholders on June 28, 1954.

On July 26, 1954, the board of directors passed the following resolution:

> "RESOLVED, that * * * Directors not otherwise compensated by the Corporation be paid for their services as members of the Board at the annual rate of $5,000 payable in semi-monthly installments.
>
> "RESOLVED FURTHER, that the members of the Board of Directors whose compensation is fixed by this Resolution shall be deemed to be *employees* for the purposes of this Resolution and shall be eligible for and entitled to those rights and benefits of salaried *employees* of the Glenn L. Martin Company to participate in its Group Insurance program, but they shall not participate in its Pension program."

Wharton was at this time vice president—finance, and director. Bunker testified that the object of changing the di-

rectors from a fee basis to a salary basis was to obtain a sort of "contractual commitment" from each of the directors, which would increase their sense of responsibility to the Company and their interest in its affairs.

On December 24, 1954, Wharton suffered a severe illness, and in May, 1955, it appeared that he would be incapacitated for another six months. He then advised Bunker that he did not intend to resume his duties as vice president—finance after recovering from his illness, but that he intended to continue as a director of the Company. On June 3, 1955, the board of directors treated a letter written by Wharton on June 1, 1955, as his resignation, and accepted it. Wharton thereafter continued as a director only until December 20, 1956, when he resigned.

Wharton's service as an officer was thus for approximately thirty-nine months, from February 21, 1952, until June 3, 1955. As both officer and director he served for approximately twenty-four months, from May 15, 1953, until June 3, 1955. After his resignation as vice-president—finance, he served as director only for approximately eighteen months, from June 3, 1955, until December 20, 1956. The total time of his service both as officer and as director was approximately fifty-seven months, from February 21, 1952, until December 20, 1956.

While he was vice president—finance, Wharton devoted substantially his full time to the affairs of the Company as an active officer. After June 3, 1955, he acted as a director only, and in that capacity he attended nine directors' meetings.

On December 4, 1956, the day before his resignation as director, Wharton attempted to exercise his option, but the Company instructed the option agent not to issue the stock, on the ground that Wharton did not qualify under Par. 4 of his option, since he had not been "employed" by the Company for forty-eight months.

The position of the Company was that after his resignation as vice-president—finance, and while he was merely a director, Wharton was not "employed." As a consequence, this suit was brought to compel the issuance of the stock covered

by the option, which, through stock dividends, now amounts to 6,063¾ shares.

No criticism is made of Wharton's work for the Company or of his conduct either as officer or director. The causes of his resignation were differences of opinion between him and Bunker as to corporate policies, and the desire of Wharton to be the head, rather than second in command, of a company.

The decision of this case turns upon the construction of certain documents. No definition of the vital words *"employed," "employee,"* and *"employment"* are contained in them. All of the documents were drawn by skilled attorneys and approved by the persons concerned, who were familiar with options and the tax laws affecting them.

The option herein concerned was dated June 30, 1952, and as stated above was originally for 5,000 shares of stock, at $9.75 per share. It was not assignable or transferable during Wharton's lifetime. It was the third of a series of similar options totaling 25,000 shares, two of which had previously been exercised by which Wharton had acquired 15,000 shares. The options differed only in their requirements as to the period during which the holder should have been employed by the Company prior to their exercise.[2] The vital words in the option here concerned are those quoted above which required the holder to be *"employed"* for forty-eight months.

An addition to the option is a letter written by the stock option committee to Wharton and accepted by him on September 23, 1952, containing the following provision which had inadvertently been omitted from the option itself:

"(b) * * * you shall in no event have the right to exercise the options during your respective lifetimes at any period beyond three months after your respective *employment* with the company ceases."

Prior to the issuance of the option, a Stock Option Plan, dated February 21, 1952, had been prepared by the stock option committee and approved by Wharton. It contained the following language:

---

2. In July, 1952, Wharton was issued another option for 7,000 shares, which is not involved in the present controversy.

"2. This Stock Option Plan shall be administered by a Stock Option Committee composed of the President * * * and not less than two Directors who are not officers or *employees* of the Company * * *."

"3. The Stock Option Committee may * * * authorize the granting to Officers (including Officers who are members of the Board of Directors) and key *employees* * * * of options * * *."

In order to obtain the approval of the plan by the stockholders, a Proxy Statement for the meeting of April 2, 1952, was issued, in which it was stated that the Stock Option Committee was to be composed of

"* * * the President of the Company and not less than two other directors who are not officers or *employees* of the Company * * *."

The Proxy Statement contained also the following statement:

"* * * under the Plan all officers of the Company, including those who are directors, would be eligible to participate; directors who are not officers or *employees* of the Company would not be eligible to *participate*."

We thus find the three words "employed," "employment," and "employee" used in these papers, and it does not appear from the record that there was any contemporaneous discussion of the meaning of any of these words, or of the word *"participate."*

A director occupies a special status, which has some aspects in common with that of ordinary workers variously called agents, servants and employees, and some aspects in common with the corporate officers.

As Mr. Machen says (*Corporations*, Sec. 1399):

"The truth is that the status of director and corporation is a distinct legal relationship. It resembles in some respects those of agent and principal, of

managing and dormant partners, of trustee and cestui que trust; but it is different from each."

and also (at footnote 3):

"Although directors are agents yet they are not servants or employees, and a director cannot be deemed a person in the employment of the company."

The Maryland cases support these statements. Judge Offutt, in *Shriver v. Carlin & Fulton Co.*, 155 Md. 51, 58, said that

"* * * [neither] a director nor any other officer of a corporation is by virtue of his office its employee, * * *."

Judge Markell, in *Warren v. Fitzgerald*, 189 Md. 476, 488, said that

"[T]he individual directors making up the Board are not mere employees * * *."

A director may be an employee of his company, if under the facts of any given case he fits the definition of an employee. In *Santa Clara Mining Association v. Meredith*, 49 Md. 389, 400, Judge Richard Grason said that

"[I]f a * * * director of a corporation renders services to his corporation which are *not* within the scope of, and are not required of him by, his duties *as* president, or director, but are such as are properly to be performed by an agent, broker or attorney, he may recover compensation for such services upon an implied promise."

In *Sun Cab Co. v. Powell*, 196 Md. 572, this Court considered the definition of "employer" under the Maryland Workmen's Compensation Act. Judge Delaplaine laid down four tests for the question of whether a person was an employer, namely whether the person concerned had the powers (1) of selection and engagement of the servant; (2) the payment of wages; (3) the power of dismissal; and (4) the power of control over the servant's conduct.

Judge Chesnut in *Yellow Cab Company v. Magruder*, 49

F. S. 605, 607, with reference to the question of whether the status of employer and employee existed, said that the test is

> "* * * whether the alleged master in any case has the right, even if he does not exercise it, to control and direct the alleged servant, not only as to what shall be done but how it shall be done."

Thus a director is neither *per se* an *employee,* nor a mere employee. Whether a director is or is not an employee depends upon the nature of his duties.

For other statements as to the status of directors, see *Warren v. Fitzgerald,* 189 Md. 476 and *Restatement of Agency* (2d), sec. 14 C.

A director is elected by the stockholders, and his duties ordinarily consist in attending meetings, exercising his judgment on propositions brought before the board, and voting. He has no power to issue orders to any officer or employee, nor can he institute policies by himself, or command or veto any other action by the board.

Ordinarily, a director is not subject to dismissal by the board or by any officer thereof, nor can he hire or discharge any employee. Nor can he be discharged by the officers, his fellow directors, by any stockholder or any employee or agent of the Company. He can be removed only through action by the stockholders.

Directors are sometimes paid and sometimes not paid. The directors of this Company were paid on three separate bases, as set forth above, two of which were by fees for attendance at meetings, and the third was by annual salaries. Neither the fact that they received money, nor the amount of money received, nor the fact that this remuneration was on a fee per meeting basis, or on an annual salary basis, seems to have made any change in their duties.

The record in the present case indicates clearly that while Wharton was vice president—finance, he gave substantially his full time to the duties of that office, exercising managerial and executive duties, presumably under the direction of the president and the board of directors.

When the system of remuneration was changed from a fee

basis per meeting to an annual basis, it is clear that although Bunker wanted to increase the sense of duty and responsibility of the directors there was no change whatever in the duties performed by any of them. Specifically, Wharton was given no daily duties, made no reports, engaged in no routine activities, and was not made a member of any committee involving additional work. His status as director was the same after July 26, 1954, as before.

After his resignation as vice-president—finance and while he remained as director, he ceased completely to exercise the functions of an officer and performed only such duties as are customary for directors. During the year 1956 he attended eight meetings of the board, and in this respect he was on a par with the other directors who were not officers. There is no evidence that he exercised managerial functions or did anything else.

While Wharton was a director, neither the stockholders nor any officer or employee, acting separately, jointly, or in any other way, could control Wharton's vote as a director.

It is undeniable that while Wharton held the office of director he had no right as a director to "hire" or "fire" any employee of the Company, or to give orders to any officer or employee of the Company, or to control the actions of any officer or employee. Similarly, neither the stockholders nor the other directors, either individually or acting as a body, had any power to control his vote or the exercise of his discretion. There was thus no element of control either by Wharton over other persons in the Company, or of his work for the Company.

We come then to the interpretation of the words *"employed," "employee," "employment,"* and *"participate"* as used in the basic documents. This must be determined in connection with the acts of the parties and in the light of the circumstances surrounding them.

The word "employed" is used in Paragraph 4 of Wharton's option. In the letter of September 23, 1952, the word "employment" is used. In the Stock Option Plan of February 21, 1952, the word "employees" is used. In the Proxy Statement the word "employees" is used.

These words are not legal or technical words of art, but are in common usage in the English language, and have many meanings. In ordinary parlance, a man's "employment" is the principal occupation by which he earns his living, and he is "employed" by some other man or organization for a money reward. But there is no necessary connection between employment and money. A man may "employ" his leisure time in cultivating his garden. A man's "employment" during the summer may be the care of his boat. A man may "employ" his time in reading for pleasure. A squad of soldiers may be "employed" in policing the camp. The term "employee" is ordinarily used to describe some person in a subordinate position.

In the present case there was no formal contract of employment which set forth the exact duties of Wharton. He was simply elected as vice-president—finance, and he assumed the usual duties of that office.

From the language in the basic documents it appears that those engaged in working out the arrangements regarded the various persons concerned as divided into at least three classes. They expressly distinguished between (1) directors who were officers; (2) directors who were not officers; and (3) key employees who were neither directors nor officers. Thus in the Stock Option Plan (Paragraph 2) there appears the phrase "Directors who are not officers" and in Paragraph 3 "Officers who are members of the Board of Directors." In the Proxy Statement the phrase appears: "other Directors who are not officers or employees of the Company," and "all officers of the Company including those who are Directors" and the phrase: "Directors who are not officers or employees."

The words relating to employment are used apparently without distinction, and there is nothing in the testimony that indicates that any distinction was intended by the use of any one of the three words "employment," "employee," and "employed" as contrasted with the others. The distinction which was not only made, but was emphasized, was the distinction between directors who were, and directors who were not, officers or employees.

In our opinion, no inference can be drawn from the use of these variations upon the word "employ." Their use was interchangeable, and as Judge Warnken said they were "used to describe the same thing." The key to the question of the meaning of these words is as Judge Warnken said, the kind of services performed, and whether those services were or were not outside of their duties as directors.

Much has been made in argument as to the meaning of the word *"participate"* used in the Proxy Statement for the meeting of April 2, 1952. On behalf of Wharton it is contended that "participate" relates only to the issuance of the option and not to its exercise. On behalf of the Company it is contended that "participate" includes its exercise as well as it's receipt.

The word "participate" like the word "employ", is not a word of art, but a word in common usage, meaning to have a part in and to share the benefits of some action or situation involving other persons.

The present option by itself created no benefits for Wharton unless or until it was exercised. It was not transferable, except upon death; it had no market value; no profits accrued from it; its receipt involved no duties. The only value it had was in its exercise. The only effect it would have upon the stockholders would result from its exercise.

The insertion of the phrase in the proxy statement that directors who were not officers would "not participate" is a clear expression of the intent of the framers of the Stock Option to exclude such directors from something. It divided directors into two classes, viz., those who were officers, and those who were not. And they described and included neither class under the term "employees." To allow at the present time a director who was not an officer to exercise his option on the ground that he was an "employee" would be at least a reversal of the statement made to the stockholders.

In our opinion the word "participate" included, and was understood and intended to include, the exercise of the option as well as its issuance. We think that the word "participate" meant to share in the benefits of the stock option plan; and

the only way in which those benefits could be shared in was by its exercise.

No action was taken by Wharton upon the strength of an understanding that he would be able to exercise his option as a director only. He testified that at the time he received the option he did not think about the matter.

Another element in the interpretation of the basic documents is contained in the provisions with respect to the constitution of the stock option committee. The stock option plan requires that the committee shall include two members of the board who are not officers or employees of the Company. If the members of the board were *"employees"* merely by virtue of being directors, all of the directors would be disqualified from serving on the committee. This provision also is an indication that members of the board, as such, who were not officers, were also not considered as employees.

By the Resolution of July 26, 1954, which instituted the $5,000.00 salary basis, the Group Insurance Plan of the Company was extended to the members of the board of directors. By that resolution it was provided that

> "[T]he members of the Board * * * shall be deemed to be employees for the purposes of this Resolution, and shall be eligible for and entitled to those rights and benefits of salaried employees of The Glenn L. Martin Company to participate in its Group Insurance Program, but they shall not participate in its Pension program."

After the passage of this resolution, the directors were paid by being placed upon the ordinary Company payroll. The appropriate returns were made to the Government for tax purposes; income taxes were withheld in the same manner as for other employees, and administrative changes in accounting were made to reflect this situation.

On behalf of Wharton it is contended that as a result, by the action of the Company itself, Wharton and the other directors were treated for all purposes as employees, and that it cannot now be contended that this action was only for the limited purposes of the Group Insurance Program. This ar-

gument ignores, however, a number of considerations. The first is that it is implicit in the resolution that the directors were to be deemed employees only to the extent of participation in the Group Insurance Program; and they were expressly excluded from the Pension Program. No change was made in their duties, and the testimony makes it clear that the object was simply to create a fringe benefit, in addition to their salaries, for the members of the board.

The fact that the Company withheld income taxes from the salaries of the board is of little significance. The testimony shows that at least one of the reasons for withholding tax was to avoid an argument with the taxing authorities, and perhaps to risk the disfavor of the Bureau of Internal Revenue. Such disfavor was more important to the Company than to most business organizations in view of the large amount of business done by it with the Government. We feel that neither the Group Insurance Plan nor the compliance, or attempted compliance, with the tax laws with respect to the option are controlling factors in determining the rights in this case.

Whether or not these actions by the Company in "deeming" the directors to be employees for certain purposes complied with the insurance laws of Maryland, in addition to complying with the withholding tax requirements of the United States, is a point that does not appear to require decision by us.

The contentions of the appellant that "the directors changed their spots" and that "the Martin Company treated Wharton and his fellow directors like ordinary employees in every possible way" are hardly justified by the conceded facts. It would seem to us more accurate to say that the Company did not treat the directors as employees in any way, except by paying them certain monies and by arranging their accounts so as to make them eligible for group insurance. The same directors were expressly excluded from the Pension Plan. In no other way were the directors treated as employees.

On behalf of Wharton it is also contended that under the modern concept of a business corporation the directors occupy positions far more closely allied to management than hereto-

fore; that both their duties and responsibilities are greater; and that we must recognize this change in the consideration of the present case. It may well be that under modern concepts directors hold positions more akin to management than heretofore, but the present case does not turn upon the validity or extent of such concepts. It turns upon the interpretation of the documents entered into by the parties concerned, and their intent at the time that the arrangements were entered into.

Bunker may have believed that the receipt of annual salaries by the directors would stimulate their interest in the Company, foster closer relations with the officers, and result in the devotion of more time and thought to the affairs of the Company. There is nothing, however, in the record to indicate that these results followed, or that there was any change in the normal and traditional duties of directors.

Looking at the situation as a whole, the intent of all parties seems to us to be both simple and clear.

The Company needed top executive management, both operational and financial, to rehabilitate its impaired financial structure, and was willing to pay generously for it, making the terms as lucrative as possible for persons retained by it, particularly from the point of view of taxes. It therefore offered Wharton a very substantial salary, subject to full income tax, and an option which could be exercised at a low rate of tax. It also divided Wharton's option into five parts, one exercisable in each year for a period of five years, in order to create an inducement to him to stay with the Company, and not leave it for greener pastures.

Wharton intended to use his abilities with the Company on a full-time basis, and to be compensated, first, by his salary, and second by the exercise of options which would realize the fruits of his labors if those labors were successful.

As far as the tax law was concerned the principal purpose, if not the only purpose, was to frame the option in such terms and such legal detail that Wharton would obtain the benefit of the capital gains tax instead of bearing the burden of the ordinary income tax.

Whether or not the word "employee" was used in the stock

option, the inference is inescapable that whatever word was used had nothing to do with the intent of the parties as to Wharton's duties or his relations with other officers of the Company. There is no indication whatever that hairsplitting distinctions were made between the words "employ," "employment," and "employee."

It is not possible nor would it be wise to attempt at this point to determine the limits or the specific tests by which in every case the status of a director as an "employee" or the terms of his service should be regarded as "employment" or whether the Company in fact was an "employer" or whether a director is "employed." Suffice it to say that on the facts of this case and by a construction of the documents set forth above, we believe that the director herein concerned, Wharton, was not an "employee" during the time subsequent to his resignation as vice president—finance. He thus had not been "employed" continuously for forty-eight months as required by the option, and was not entitled to exercise the option involved herein.

The decree of the lower court is therefore affirmed.

*Decree affirmed, with costs.*