James W. SHAFFER, Respondent,

v.

TERRYDALE MANAGEMENT
CORPORATION, Appellant.

No. WD 32987.

Missouri Court of Appeals,
Western District.

March 1, 1983.

David A. Welte, Polsinelli, White & Schulte, Kansas City, for appellant.

Albert Thomson, Linde, Thomson, Fairchild, Langworthy, Kohn & Van Dyke, Kansas City, for respondent.

Before SHANGLER, P.J., and PRITCHARD and DIXON, JJ.

SHANGLER, Presiding Judge.

The plaintiffs Shaffer and Burrus brought an action for declaratory judgment to determine the right of defendant Terrydale Management Corporation to exercise an option to purchase their shares under the terms of a stockholders agreement. The plaintiff Burrus died during the pendency of the action and the widow as administratrix was substituted as a party. The trial court adjudged that Shaffer and Burrus were not in the "employment" of the Terrydale Corporation within the sense of the stockholders agreement and so, upon "termination of employment," their shares were not subject to the purchase option provision of that document. The court directed Terrydale to reinstate Shaffer and Burrus on the corporate records each as owner of 50 shares of the corporation stock. The trial court adjudged also that under the stockholders agreement Terrydale had the right to exercise the option to purchase the Burrus shares upon his death. The defendant Terrydale Management Corporation appeals only from the declaratory judgment in favor of Shaffer.

Terrydale Management Corporation was created to administer the assets of a real estate investment trust of commercial properties owned by J. Russell Gramlich. The trust idea, although original with Gramlich, was given form by the plaintiff Shaffer, an attorney, and the plaintiff Burrus, a financier and banker. The investment trust was made to qualify for public issue and was underwritten by a brokerage house. [The special work to accomplish the SEC certification was done by other law firms in occasional consultation with Shaffer.] The Gramlich assets were transferred into the trust [Terrydale Realty Trust] for an equivalent value of shares. The tax laws required that an entity separate from the trustees manage the investment trust, and the Terrydale Management Corporation was formed to administer those assets. The plaintiff Shaffer performed that work and became the management corporation attorney. Gramlich then directed Shaffer to prepare a document to insure that the corporation remain a family enterprise. The result was the stockholders agreement now in contention.

The real estate trust was the device attorney Shaffer chose as the estate plan for Gramlich. In the recent past, Gramlich was bereft of his wife and had come into sole ownership of a number of commercial properties from the dissolution of a partnership enterprise, and so Gramlich turned to Shaffer for advice. Shaffer, as well as Burrus, earned his trust some time earlier when they extricated Gramlich from an imminent financial loss and transformed that real estate venture into a profitable transaction. The three, Gramlich, Shaffer and Burrus, worked together to develop the real estate investment trust. Gramlich and Shaffer worked together to formulate the management corporation and the shareholders agreement. Shaffer was not only the attorney for the management corporation, but the Gramlich personal attorney, as well. Burrus was then the executive vice-president and loan officer of Columbia Union National Bank. The Terrydale Realty Trust and the Terrydale Management Cor-

poration became active in year 1972. Shaffer served as director, sometimes as officer, as well as counsel, for the management company from incorporation until year 1978. Shaffer served also as consultant from year 1973 through year 1979 and received a stipend of $500 per month for that separate service. Shaffer was paid additional fees for legal counsel and commissions for real estate services. Burrus also served as director of the corporation virtually from inception as well as consultant until the end of year 1979. He was paid $500 per month for the consultation duty and was paid additional commissions for loan placements.

Terrydale Management Corporation was the instrumentality devised to administer the assets of the Terrydale Realty Trust. The investment trust was comprised of the assets of Gramlich alone, and the management company was also in actual effect his sole ownership. Gramlich designated the other shareholders to Shaffer and the number of shares allotted to each. [As Shaffer explained: "It was his company."] There were seven shareholders named and to each Gramlich assigned an ownership: son John—5%, son-in-law Baker—5%; son-in-law Kostoryz—5%; employee Leach—5%; employee Dutton—5%; Shaffer—10%; Burrus—10%. Gramlich retained control with 55% of the shares.[1]

In anticipation of the incorporation of the management company, Gramlich instructed Shaffer to prepare a document to ensure the option of the corporation to redeem the stock of a shareholder who became inactive.[2] That concern was prompted by an experience of dissension and deadlock as an investor in a closely held corporation. Shaffer was experienced in such matters and agreed to draft the document as Gramlich directed. In this professional exercise [as he acknowledges] Shaffer acted as counsel for *both* Gramlich and the Terrydale

1. The face of each share shows a par value of $1.00. Thus, Shaffer and Burrus paid $50 for his respective 50 shares—equivalent to 10% of the corporation ownership. Shaffer asserts [in the context of the full argument we consider and decide in the course of opinion] that the sum paid was good consideration for the shares and that any construction of the stockholders agreement must give effect to that indicium of a *bona fide* ownership. That argument means to suggest, we assume, that since Gramlich gave the 5% interest to Dutton and Leach "because of their long and faithful service" and since the stock ownerships by the son and sons-in-law were allocations based on kinship, on the Shaffer and Burrus ownerships [other than by Gramlich, himself] were veritable stock purchases. The evidence gives no reason to suppose that the others did not also remit the $1.00 par value consideration the stock certificates recite.

The evidence was, rather, that the distribution of the shares to Shaffer and Burrus for that nominal money exchange was a mark of favor for faithful service and as a means to reward them for past work. Gramlich was not able to pay Shaffer and Burrus for the investment trust work at the time because the public issue required more of his personal funds than expected. Gramlich used the stock distribution to them, the $500 monthly stipend to each for consultation services, and the opportunity the management corporation afforded each to earn real estate commissions as the means for the deferred recompense. In addition, Shaffer was paid professional fees as attorney for the cor-

poration, and even other fees for services rendered Terrydale by his personal tax adjustment corporation [RETCO]. Shaffer received from Terrydale Management some $100,000. Burrus, in addition to the monthly retainer, earned at least one $5000 commission for a loan placement for the investment trust. Gramlich was frank to testify that one determinative reason for the Burrus appointment as a director of the management company was his position as loan officer and executive vice-president at the Columbia Union National Bank.

The book value for the 50 shares in the fledging corporation for which Shaffer and Burrus had paid $50 each in year 1972 had become $8,068.50 by year 1980 when the management company asserted its option to redeem under the stockholders agreement. Shaffer and Burrus resisted the right of the corporation, as they do now, on the premise—we consider fully in the course of opinion—that they were not subject to the corporation redemption option on the terms the corporation asserts. Shaffer kept open, however, possibility of a negotiated sale of the shares to the corporation. Burrus died in the course of litigation, and the corporation redeemed his shares under a separate, and uncontested, provision of the stockholders agreement.

2. The nature of the instructions from Gramlich to Shaffer as to the purpose and content of the document was in dispute. We defer that full discussion.

Management Corporation. In due course, a Stockholders Agreement was drafted, and contained the provision since in dispute:

> In the event that any of the parties hereto (which party or his legal representative is herein called the "Disposing Shareholder") *terminates his employment with the Company,* dies or desires to sell, pledge, hypothecate, donate, transfer, or otherwise dispose of or incumber any of the shares of the company . . . *then* in any such event *the Company shall have* and is hereby granted *an irrevocable option to purchase all or any portion of its shares* owned by such disposing shareholder at the purchase price hereinafter provided. [emphasis added]

The shareholders Shaffer, Burrus, son Gramlich, Baker, Kostoryz, Leach and Dutton were all signatory to the stockholders agreement, and the shares as issued recited subordination to the restrictions declared in that agreement. Gramlich was not a personal signatory, and his ownership of shares was not affected by the terms of the document. In November of 1977 the agreement was amended to relieve son Gramlich and son-in-law Kostoryz from the obligations of the restrictions. In July of 1979, Gramlich fell ill and resigned from all responsibilities with Terrydale. The son Gramlich assumed that management duty. Shaffer and Burrus ceased all active participation in Terrydale affairs by the end of the year 1979. On January 16, 1980, Terrydale [per son Gramlich now advised by new counsel] terminated the monthly $500 consultation stipend. On February 25, 1980, counsel notified Shaffer and Burrus: "[d]ue to the fact you are no longer employed by Terrydale Management Corporation" the company exercised the option vested by the stockholders agreement to purchase the 50 shares each owned in the corporation. Terrydale tendered $8,068.50 to Shaffer and Burrus for the 50 shares owned by each at the determined book value of $161.37 per share. Shaffer and Burrus refused to redeem the stock on the contentions they were neither in the *employment* of the company nor did they *terminate* any employment—so that those terms of the stockholders agreement

were not operative as to them. They brought an action for declaratory judgment to vindicate that construction of the document.

The court prefaced judgment with findings of fact and conclusions of law. The court determined as propositions of law that;

> neither Burrus nor Shaffer was an employee of, employed by, or under "employment" by Terrydale . . .

and

> the consulting arrangement that both Burrus and Shaffer had with Terrydale was terminated by the unilateral action of John Gramlich, the new President of Terrydale, without the consent or approval of Burrus or Shaffer.

The court then decreed [and thereby implicitly adjudged that Shaffer and Burrus were not in the *employment* of Terrydale as that term is used in the stockholders agreement] that Terrydale reinstate Shaffer and Burrus on its records as owners of 50 shares of the corporation stock. The court thus came to judgment by principles of contract construction.

Terrydale contends on appeal that the court employed wrong principles of construction—or, at least, principles unexplicated. And, indeed, the conclusion of law entered by the court that neither Burrus nor Shaffer was an *employee of, employed by, or under "employment" by Terrydale* amounts to an adjudication that the meaning of the contract term *under employment* —the very subject of the declaratory judgment action—was manifest from the term itself. *Grantham v. Rockhurst University,* 563 S.W.2d 147, 150[2–11] (Mo.App.1978); Restatement (Second) of Contracts § 212(2) (1981). Terrydale contends that *employment* and *terminates* are ambiguous in context and that the court erred by failure to interpret those words in accordance with the obvious purpose of the stockholders agreement as disclosed by the entire contract formation transaction: to require shareholders, become inactive, to redeem their stock to Terrydale. The trial court

received the testimony of Shaffer and Gramlich on what prompted Gramlich to that undertaking, the purpose of the stockholders agreement, the Gramlich directions to Shaffer to that end, and the understanding counsel attributed to them. The court, nevertheless, made no assessment of credibility, nor found the fact from among the conflict of evidence, nor expressly construed the document before it for adjudication, but simply declared as a matter of law that "neither Burrus nor Shaffer was an employee of, employed by, or under 'employment' by *Terrydale.*" [emphasis added]

To the extent facts were found, they contradict the conclusion of law and the record. Thus the findings of fact [numbers 10 and 11] that: *"Burrus was employed by Terrydale* as a consultant" and *"Shaffer was employed* as a consultant and was employed as an attorney *by Terrydale"* [emphasis added] gainsay that declaration of law.

■ The finding of fact [number 5] that the instruction by Gramlich was for Shaffer to prepare a document "which would permit Terrydale to purchase the stock of *any Terrydale employee [shareholder who] voluntarily left the employ of Terrydale"* simply has no basis in the record. There were two sources of the evidence on that issue— Gramlich, who gave the directions as to the purpose and content of the stockholders agreement, and Shaffer who, as lawyer, was directed. Shaffer testified that Gramlich wished to reward longtime employees Leach and Dutton for faithful service and

so designated them among the seven minority stockholders and apportioned shares to them, "but that he wanted a restriction placed on the stocks so that *if they ever quit the company,* the company would have the right to have the stock returned to it." [emphasis added]

It was the Gramlich testimony that he informed lawyer Shaffer the intention was to "keep this a family project and . . . that it be drawn in the agreement that in case *any of these people* [Leach, Dutton, Shaffer, Burrus, Kostoryz, Baker and son Gramlich] died, retired or *[was] fired or for any reason they were not actively engaged in the company,* that we [Terrydale] would have the opportunity to buy their stock back." [emphasis added] There was no source in the record for the fact found by the court, either as an assessment of credibility or as a legitimate inference from evidence in competition, that *any of the stockholder-employees who voluntarily left the Terrydale employment* were intended to be subject to the stockholders agreement. The inference allowable to the factfinder was *either:* the document was intended to cover *all* the employees, whatever the manner of termination; *or:* the document was intended to cover the *two* employees Leach and Dutton upon voluntary separation from the company. The fact found by the court— that Gramlich intended the document to operate as to *any* stockholder-employee who *voluntarily* left Terrydale—was an amalgam of quasi inferences without support in the evidence.[3] The judgment virtually

---

**3.** There was deposition testimony given by Shaffer which allowed the inference that the directions by Gramlich were to prepare a document to protect the corporation in the event *any* of the shareholders [except Gramlich, himself] died or otherwise elected to sell the owned shares. Shaffer was not entitled to the benefit of any such inference, however, nor was the adjudicator entitled to find any such fact because it was repeatedly and insistently disavowed by the Shaffer testimony at the trial. Shaffer repeated at least three times—in the face of the deposition impeachment—that his only instructions were that the instrument was to cover the *two employees,* Dutton and Leach, and then *only upon voluntary termination* or retirement. The party Shaffer was bound by

his own testimony and was not entitled to the inferences of the deposition evidence he disavowed. *Strauss v. Hotel Continental Co., Inc.,* 610 S.W.2d 109, 112[3, 4] (Mo.App.1980).

There was other evidence by Shaffer that Gramlich, in his directions, did not mention that the shareholders other than Leach and Dutton should also be restricted by the document, but that Shaffer, nevertheless "did prepare it that way [to include all the minority shareholders] and he [Gramlich] did agree that that's the way it should be prepared." The full Shaffer evidence evinces clearly that the text of the document was never more than only generally described to Gramlich. Shaffer testified more than once that "there is nothing in that document he [Gramlich] did not agree to or

rests on that spurious finding of "fact," and therefore is erroneous. *Murphy v. Carron,* 536 S.W.2d 30, 32[1–3] (Mo. banc 1976).

■ The court came to judgment, not only by a finding of salient fact not based on the evidence, but also by a conclusion of law reached by error. The proposition of law declared by the court as preface to judgment that "neither Burrus nor Shaffer was an employee of, employed by, or under 'employment' by Terrydale," in effect, construes that the meaning is manifest as the term stands. The court nevertheless received the evidence of the antecedent process between Shaffer and Gramlich which culminated in the written words of the agreement. That evidence was in serious dispute, yet the court made no determination of credibility, nor finding of fact as to the meaning, under the evidence, Gramlich intended for the term *employment* in his directions to Shaffer.[4] The conclusion of law that Burrus and Shaffer were not under *employment* with Terrydale assumes that the term [or the variants, *employee, employed*—also used in the testimony to describe the relationship between some of the shareholders and Terrydale] has a single and invariable meaning. In terms of contract construction, rather, the meaning of the term *employee* is as variable as the context of use, the purpose of the contract and the end to be accomplished. "[T]he word 'employees' should be interpreted in a broad and nontechnical sense without imposing restrictions and limitations which would emasculate the [contract] and defeat its purpose." *Krueger v. Elder Mfg. Co.,* 260 S.W.2d 349, 352[2, 3] (Mo.App.1953);

*see also* 30 C.J.S. Employment (1965). In the very words of opinion of the authority cited by Shaffer on the issue [*Wharton v. Fidelity-Baltimore National Bank,* 222 Md. 177, 158 A.2d 887 (Md.App.1960)]:

l.c. 889:

The decision in this case turns upon the construction of certain documents. No definition of the vital words *"employed," "employee"* and *"employment"* are contained in them.

\* \* \* \* \* \*

l.c. 892:

These words are not legal or technical words of art, but are in common usage in the English language, and have many meanings.

l.c. 895:

It is not possible nor would it be wise to attempt at this point to determine the limits or the specific tests by which in every case the status of a director as an "employee" or the terms of his service should be regarded as "employment" or whether the Company in fact was an "employer" or whether a trustee is "employed." Suffice it to say that *on the facts of this case* .... [emphasis added]

The stockholders agreement contained no definition of the *employment* term. The text of the document, therefore, disclosed no manifest purpose that the term be understood in a particular technical sense [the IRS usage of *employee* which apparently prompted the conclusion of law that neither Burrus nor Shaffer was under the employment of Terrydale—and hence the judgment against Gramlich]. The trial court,

---

would not have signed." Yet, the only *specific* content Gramlich knew about, as Shaffer insisted repeatedly, was the purported directions Gramlich gave him as the purpose of the stockholders agreement: that the document was to cover Leach and Dutton should either leave Terrydale voluntarily.

The subject of the finding of fact [number 5], in any event, was not how Shaffer actually prepared the document, but how Gramlich instructed Shaffer, as his attorney, to prepare the document. That finding has no substantial evidence to support it.

**4.** It was the testimony of Shaffer that the term *employment* as used in the agreement was

meant in the same sense "that the Internal Revenue Service would use in describing whether or not a person is an employee." Shaffer could not say whether he did or did not inform Gramlich that such a definition would govern the operation of the stockholders agreement. [We allude to that nondisclosure again, in fuller context, in the course of opinion.] The conclusion of law of the court that "neither Shaffer nor Burrus was an employee of, employed by, or under 'employment' by Terrydale" implicitly accepts the validity of the Shaffer testimony.

nevertheless, interpreted *employment* as a word of art rather than according to common usage, a meaning variable according to the purpose of the document, and a meaning disclosed by the full circumstances of the transaction. *Foley Co. v. Walnut Associates,* 597 S.W.2d 685, 688[1–6] (Mo.App. 1980); *Phipps v. School District of Kansas City,* 645 S.W.2d 91, (Mo.App.1982); Restatement (Second) of Contracts § 201, comments b and c; § 202, comment c (1981).

That the sense of the term *employment* as used in the document, and its variants, *employ* and *employee,* as used by the court and witnesses, was not free from doubt—unless understood within the context of the purpose of the use—is shown from the trial proceedings itself. In response to question from counsel: "Have you ever been employed by the Terrydale Management Corporation?" Shaffer answered: "I have *never been an employee.* I have been *employed* as that corporation's attorney." [emphasis added] Also, the conclusion of law [number 1] entered by the court—"neither Burrus nor Shaffer was an employee of, *employed by,* or under 'employment' by Terrydale" not only contradicts the Shaffer affirmation of fact that he was *employed* by Terrydale, but, as we noted, contradicts its own finding of fact [number 11] that "Shaffer was *employed* as a consultant and was employed as an attorney by Terrydale." [emphasis added]

The decision of the trial court rests on findings of fact [numbers 10 and 11] without support in substantial evidence, on a conclusion of law [number 1] contradicted by findings of fact [numbers 10 and 11] and, as we show, by other findings of fact [numbers 4, 5 and 6] which describe a subsistent attorney and client relationship between Gramlich and Shaffer, but conclusions of law and a judgment which give no account to the fiduciary quality of the transaction. Thus, the judgment, among other lapses, rests on findings not supported by evidence, on errors of law, and otherwise against the weight of the evidence. We redetermine the facts, redeclare the law of the case, and enter the judgment the trial court should

have found. *Murphy v. Carron,* 536 S.W.2d 30, 32[1–3] (Mo. banc 1976); *Monnig v. Lewis,* 617 S.W.2d 492, 497[3] (Mo.App. 1981); *Urban Expansion, Inc. v. Fireman's Fund Insurance Company,* 592 S.W.2d 239, 241[1–2] (Mo.App.1979).

■ The Terrydale Management Corporation was a necessary adjunct to the Terrydale Realty Trust. The real estate trust consisted of properties owned wholly by Gramlich, and the management corporation was also his own. Gramlich contributed all of the capital, paid all expenses of incorporation, and funded the operation during the early months. "It was his company" as Shaffer acknowledged. Gramlich, as an act of largesse to family members, to Leach and Dutton for faithful employment, and to Shaffer and Burrus for past services, decided to distribute 45% of the shares in the management corporation to those seven as minority stockholders. The payments by each of the seven of one dollar per share was token and nominal. The risk of loss was all his. The seven were [as Shaffer described them] the "people who [were] going to run this company, who were involved in the past history of getting to this point, to be involved in this and he wanted them to be the shareholders and he didn't want the stock sold to outsiders." The management company was designed to be a closely-held corporation.

Gramlich and Shaffer, as each acknowledges of the other, were astute practitioners—one as a businessman and the other as a lawyer for businessmen. Shaffer was familiar with the purpose of stockholders agreements for close corporations; he had formulated some two or three dozen of them. Gramlich understood from past experience that it was not usual for a close corporation to pay dividends—that the emoluments, from considerations of taxation, issued as salaries and bonuses. For that very reason, Gramlich considered it important "that we didn't have any passive stockholders ... I thought any passive stockholder would be very dissatisfied and ultimately could cause us considerable trou-

ble." It was his purpose to ensure that "if anybody became incapacitated or unable to work or were no more an active participant in the company, I wouldn't want them to be a shareholder." Those concerns prompted Gramlich to instruct Shaffer to draw the agreement so "that in any case any of these people died, retired or [was] fired for any reason they were not actively engaged in the company that we would have the opportunity to buy their stock back." Shaffer understood that Gramlich wished to make gifts of the Terrydale stock to the seven persons who would actively operate the corporate business and upon whom success depended. Whatever contention Shaffer makes that the literal instruction was to restrict only the Leach and Dutton shares, the stockholders agreement actually formulated encompasses *all seven* minority shareholders and conditions the receipt of the shares upon written consent to that subordination. Whatever contention Shaffer makes that the literal instruction to restrict the shares of the two employees to require them to make redemption to the corporation should either *quit* employment, the stockholders agreement actually formulated subjects them [and all others save Gramlich] to the option of the company to purchase in the event the shareholder "terminates his employment, dies or desires to sell, pledge, hypothecate, donate, transfer, or otherwise dispose of or incumber any of the shares of the company."

That Gramlich selected the seven for their distinctive aptitudes—"employments" —in the operation of the company, and that Shaffer understood that the ownership of the shares was an incident of those "employments" is evident from the words of his response as to what he conceived to be the purpose of the shareholders agreement:

> The whole effect [of the proposed stockholders agreement] was that Russ [Gramlich] wanted these seven (7) *people who are going to run this company, who were involved in the past history of getting it to this point, to be involved in this* and he *didn't want the stock sold to outsiders.* [emphasis added]

Shaffer for some time before January of 1980, when Terrydale made demand for him to redeem his shares in the corporation, had been an "outsider"—as Shaffer expresses it. He was disassociated altogether from any active function with Terrydale, either as consultant or as attorney, after November of 1977. Although he continued to receive the $500 per month stipend as a consultant, he rendered no service after son Gramlich succeeded to the corporate management in November of 1977 due to the debility of father Gramlich. Thus, from that time, Shaffer was no longer an active participant in the business of the corporation; he performed no function—"employment"—for the business; he was no longer "involved" in that enterprise; he was an "outsider."

One usual motive for a restrictive agreement among shareholders is to assure the succession in interest of persons most likely to act harmoniously with the other shareholders. 12 W. Fletcher, Cyclopedia of the Law of Private Corporations § 5461.6 (perm. ed. 1971). Another, is to restrict ownership to a small group, knowledgeable and interested in the corporation business. Gregory, Stock Transfer Restrictions in Close Corporations, 1978 S.Ill.L.J. 477, 479. The rationale which confines, in a close corporation, ownership of the shares to persons interested and active in the participation of the business of the enterprise is given with particular acuity in F. O'Neal, Close Corporations § 7.02 (2nd ed.1971):

> *Whenever the shareholders' active participation in the business is necessary to its success, free transferability of shares is particularly undesirable.* If a shareholder performs an essential task, the possibility that he may sell his shares to an outsider is a serious threat to that enterprise. A purchaser of shares may have neither the ability nor the desire to do the work previously performed by his vendor, or he may not be able to work congenially with the other participants. It is often unlikely that his personality and skills would harmonize with and complement those of the existing shareholders. Yet he would be entitled, incident to his share ownership, to a voice in the management,

a share in profits, and the right to examine the corporate books and records.

*A purchaser interested only in investment would also be a hazard to the enterprise, for there would be a great possibility of friction with the active shareholders. The active participants in all likelihood would not be willing to place on the payroll a shareholder who contributed nothing in return for his salary.* They might well feel that the profits of the business were due largely or entirely to their own efforts and talents, and would be opposed even to paying substantial dividends to a shareholder not actively contributing to the corporation's success.[5] [emphasis added]

The condition of discord and impasse between a shareholder in a close corporation—once active but now passive—whose ownership remains freely transferable, and the other shareholders—all still active [a condition this preeminent and other authority agree it is the function of a restrictive stockholders agreement to avoid]—is made all but inevitable by the meaning Shaffer posits for the *employment* and *termination of employment* terms of the document—terms he himself fashioned.

If the meaning Shaffer attributes to the *employment* and *termination of employment* terminology of the document obtains [the Internal Revenue Service definition of *employee,* so as to exclude his shares even after his ownership was only passive], then the stockholders agreement as devised was not only contrary to the purpose the full circumstances show Gramlich intended, and the understanding Shaffer brought to the task, but also contrary to sound precept. In that event, Shaffer holds the shares as an investor in a close corporation, with all the technical rights of stock ownership, but without expectation of dividends or influence in the management, an incongruity of status and a source of discord a stockholders agreement is designed to avoid.

The declaratory judgment, decided on contract principles, that Shaffer was neither under *employment* by Terrydale nor *terminated his employment* within the meaning of the stockholders agreement, and so was not subject to the first option of Terrydale to compel the sale of the Shaffer shares rests on errors of law, on findings not supported by evidence, and is otherwise against the weight of the evidence. We determine that the full circumstances of the transaction considered—the situation of the parties, the distinctive business purpose intended by the stockholders agreement, the discussions between the principals antecedent to that written integration, and the conduct of Shaffer thereafter—the word-meaning intended for *employment* within the context of the document was a shareholder actively engaged in the affairs of the corporation and described the relationship of *all* the minority stockholders [Shaffer included] at the time the shares were distributed to each, and that the word-meaning intended for *terminates employment* was a shareholder no longer actively engaged in the affairs of the corporation, for whatever reason. Restatement (Second) of Contracts §§ 201 and 202 (1981).

■ The judgment rests on an error even more fundamental. Shaffer asserts a right of contract as a *shareholder* against the corporation Terrydale under a stockholders agreement, and the court adjudicates on that premise. The stockholders agreement, however, was a formulation by Shaffer as *attorney* for Gramlich-Terrydale. Thus, the petition for declaratory judgment was a suit by an attorney to vindicate a claim of right adverse to the client which arises from the very subject matter committed by the client to the attorney. The trial court noticed an existent attorney-client relationship between Shaffer and Gramlich-Terrydale at the time the corporation was formed

---

5. Our decisions recognize the valid business purpose served by restrictive provisions on the transfer of the shares of a corporation. *State v. Sho-Me Power Co-Operative,* 356 Mo. 832, 204 S.W.2d 276, 280[2] (banc 1947); *Powell v. Kennedy,* 463 S.W.2d 802, 807[3] (Mo. banc 1971).

and the restrictive document was prepared, but gave it no effect in the judgment.[6]

Shaffer acknowledges that the stockholders agreement [under which he claims] was not an arm's length negotiation, but a document prepared by a lawyer according to the intendments of a client and then imposed upon all the minority shareholders [Shaffer included] as a condition of ownership. The question then becomes whether the right lawyer Shaffer now claims adversely to client Gramlich-Terrydale, and which derives from the subject-matter entrusted to his care [a stockholders agreement in terms faithful to the intendments of the client], was disclosed to the client and given acquiescence. In precise terms: did attorney Shaffer fully inform Gramlich-Terrydale that the *employment* and *terminates employment* terms of the stockholders agreement, otherwise ostensibly applicable to all the minority shareholder subscribers, did not appertain to Shaffer and Burrus because the function of neither came within the Internal Revenue Service definition of *employee*—and with that full knowledge did Gramlich-Terrydale subscribe to the document terminology? The claim by Shaffer, although based on a culminated contract, is governed not by principles of contract construction, but by the more exact standard of the duty of a lawyer to a client. *In re Conrad,* 340 Mo. 582, 105 S.W.2d 1, 10[4–9] (banc 1937).

 The relation between attorney and client is fiduciary and binds the attorney to a scrupulous fidelity to the cause of the client which precludes the attorney from any personal advantage from the abuse of that reposed confidence. *Demmel v. Hammett,* 360 Mo. 737, 230 S.W.2d 686, 689[1–4] (1950). Once the attorney and client relationship begins, the attorney sustains a

trust relation to the client as that which obtains between a trustee and cestui que trust, a guardian and ward, or a principal and agent. *Morton v. Forsee,* 249 Mo. 409, 155 S.W. 765, 775[3] (banc 1913). The stringency of the standard that an attorney may not obtain a self-advantage from subject-matter committed to him by the client, except with the knowledge and consent of the client serves to ensure the integrity of that relationship. *Jo B. Gardner, Inc. v. Beanland,* 611 S.W.2d 317, 320[3–5] (Mo.App. 1980). 2 Mechem, a Treatise on the Law of Agency § 2289 et seq. (2d ed. 1982), explains:

> The relation of attorney and client is one of special trust and confidence. From the free and intimate disclosures required by that relation, the attorney acquires, not only a full knowledge of this client's business and affairs, but of his necessities and weaknesses as well. His position is that of a confidential adviser and he naturally has great influence over his client. To an unscrupulous man, the attorney's position, in many instances, offers great temptations to take advantage of the knowledge acquired to make gain for himself by preying upon his client's confidence or necessities. The law, therefore, very properly requires that all of the dealings between the attorney and his client shall be characterized by the utmost fairness and good faith, and it scrutinizes with great closeness all transactions had between them.

The transcendent duty of loyalty, therefore, that unless otherwise agreed, the agent acts solely for the benefit of the principal and may not act in competition by acquisition of interests adverse to the principal, governs the attorney and client relationship. Restatement (Second) of Agency § 387 (1958). Our law does not allow, therefore, both as a

---

6. The evidence does not dispute that Shaffer represented Gramlich for both personal and business matters at the time the corporation was formed and the stockholders agreement was formulated. Findings of fact 4, 5 and 6 merely formally delineate that conclusive evidence:

> At the time of the preparation of the Stockholders Agreement which is the subject of

this action, the defendant [sic] was ... corporate counsel of Terrydale, counsel for Terrydale Trust, and personal counsel for Russell Gramlich.
Gramlich instructed Shaffer, his attorney, to prepare a document ....
Pursuant to the instructions of Gramlich, Shaffer prepared the Stockholders Agreement ....

matter of policy and equity, for an attorney to harbor an interest adverse to that of the client as to the subject-matter of the representation and denies the attorney any personal advantage or profit from such a transaction—unless with the information and consent of the client. *Demmel v. Hammett,* 360 Mo. 737, 230 S.W.2d 686, 689[1–4] (1950) restates the principle with emphasis:

" '[A]n attorney cannot deal for himself in the subject-matter of the litigation to the prejudice of his client's interest, *and can in no case, without the client's consent, buy and hold, otherwise than in trust, any adverse title or interest touching the thing to which his employment relates . . .* It is contrary to the policy of the law, and also contrary to the principles of equity, to permit an attorney at law to occupy at the same time and in the same transaction the antagonistic and wholly incompatible position of adviser of his client concerning [in this case] a pending litigation threatening the title to his property and that of the purchaser of such property in opposition to the title of his client.' " [parenthetical comment added]

*See also* 7A C.J.S., Attorney & Client §§ 237 and 238 (1980); 7 Am.Jur.2d, Attorneys at Law §§ 48–50 (1980); Rule 4, Code of Professional Responsibility, Canon 5 EC 5–3 and DR 5–104(A).

The business committed to Shaffer by Gramlich was to draft a stockholders agreement to restrict the transfer of the shares in the Terrydale Management Corporation by the seven persons, who Gramlich, then sole owner, designated as minority owners in the company. Shaffer was among the persons Gramlich designated for ownership.

Shaffer recalls the Gramlich concern was that the shares owned by two distributees, Leach and Dutton, be subjected to an option by the corporation to purchase in the event either should quit. [Gramlich, we recall, described the instruction as a direction to Shaffer that the document restrict the shares of *all* the minority shareholders to allow Terrydale to redeem should any become inactive in the corporation business, for whatever reason.] Whatever the perceived instruction, the instrument actually formulated encompasses *all* seven minority shareholders [Shaffer included] and subjects their shares to the stockholders agreement and the restriction of the redemption option provision Shaffer now disputes. The seven minority are all designated as party to the stockholders agreement, subscribed their agreement to its terms, and the transfer of the shares distributed to them by Gramlich were in express terms subordinated to the restrictions imposed by the agreement.

■ Shaffer asserts that the *employment* and *terminates employment* terminology in the stockholders agreement [one of the contingencies which operated to favor Terrydale with the option to redeem those shares] was not meant to apply to either himself or Burrus [7] because neither was an *employee* according to Internal Revenue Service definition, and therefore not in the *employment* of the corporation. In effect, Shaffer claims a singular benefit from the document formulated as attorney for Gramlich-Terrydale: that the *employment* restriction upon the transfer of shares owned by the other minority shareholders did not apply to him [or Burrus]. It is a claim antagonistic

---

**7.** Our exposition, of course, deals with the attorney-client relationship between Shaffer and Gramlich-Terrydale, and does not affect Burrus. His claim to be excluded from the *employment—terminates employment* restriction of the stockholders agreement rests on right of contract. Burrus is not an appellant. He died before judgment and Terrydale made redemption of his shares under the *dies* restriction of the paragraph in issue. Neither Shaffer nor the Burrus estate disputes that the *dies* contingency [still another element of the document Shaffer, by his own acknowledgment, included although not specifically directed] operated to vest Terrydale with the option to redeem. Our contract construction rationale of the *employment* and *terminates employment* terminology of the agreement would have concluded the contract claim against Burrus, as it does against Shaffer—if it can be assumed, as did the trial court, that the Shaffer claim on a contract, born of the attorney-client relationship, and adverse to the interest of the client, is subject to the rules of contract at all. *In re Conrad,* 340 Mo. 582, 105 S.W.2d 1, 10[4–9] (banc 1937).

to the interest of the client simply because it would allow Shaffer to negotiate the sale of the shares rather than to submit to redemption at book value. An attorney who derives a personal benefit from the subject-matter of the representation adverse to the interest of the client has the burden to prove the utter propriety of the transaction—that there was no undue advantage of the client, nor a breach of confidence, but that the client understood well and acquiesced. *In re Conrad,* 340 Mo. 582, 105 S.W.2d 1, 10[4–9] (banc 1937); *Jo B. Gardner, Inc. v. Beanland,* 611 S.W.2d 317, 320[3–5] (Mo.App.1980); 2 Mechem, A Treatise on the Law of Agency § 2293 (2d ed. 1982). In a word, the attorney must make such disclosure as will enable the client to deal at arm's length. *Morton v. Forsee,* 249 Mo. 409, 155 S.W. 765, 775[3] (banc 1913).

The evidence does not prove that Shaffer ever informed Gramlich that the document term *employment* did not apply to himself, or that the term was to be understood according to the definition Shaffer harbored—the Internal Revenue Service standard—but not elaborated in the document or disclosed to Gramlich. Shaffer could not say whether he "did or didn't" inform Gramlich that document term *employment* did not include himself. Gramlich was emphatic that Shaffer made no such disclosure

to him, and the clear sense of the evidence is that he did not. Shaffer acknowledged that the agreement included "things which I as an attorney am aware that I placed in there to make the document work which he did not specifically in advance tell me to put in there." Shaffer insisted there was "nothing in that document that he did not agree to or he would not have signed it." It is so that Gramlich signed the document, but the term *employment* as written, even if read,[8] does not inform the client that it applies to the other minority shareholder-subscribers but not to the drafter-attorney, or that it bears implications of advantage to the attorney at the expense of the client. It is also true that Shaffer testified that although Gramlich instructed only as to Leach and Dutton and "did not mention in his directions . . . [that] *the other minority stockholders should also be restricted by that document* . . . [Shaffer] did prepare it that way and *he* [Gramlich] *did agree that's the way it should be prepared*" [emphasis added]—but that does not suggest that Gramlich understood that any single minority shareholder [attorney Shaffer in particular] would enjoy a favored position against the corporation as the effect of any restriction. That attorney Shaffer, engaged by Gramlich to protect his closely held interest in the incipient corporation against the

**8.** Gramlich did not read the document before he signed it. He explained that he trusted counsel, and merely followed a usual practice. Gramlich read the text of the agreement for the first time after Shaffer filed suit and long after the seven minority shareholders signed the document. Despite the Shaffer assertion that "there [was] nothing in the document that [Gramlich] did not agree to or he would not have signed it," Shaffer gave no evidence of the Gramlich agreement to any particular terms other than the signature itself. There is no evidence that Gramlich was aware of any specific content in the agreement or that Shaffer explained any particular aspect of the document to Gramlich. Nor was Shaffer able to recall any specific conversation with Gramlich concerning the instrument other than the original direction about Leach and Dutton and that "based on his instructions, I prepared it and signed it." That assertion, of course, is made doubtful by another assertion that he included terms in the document not directed by Gramlich—"to make it work."

The judgment of the trial court in favor of Shaffer, as we note, anomalously rests on principles of contract without regard to the transcendant attorney-client relationship. The court accorded significance to the Gramlich signature on the document by finding of fact number 7:

Gramlich, by signing the agreement as President of Terrydale, is deemed to have known the terms of the Agreement and consented to them.

This finding [mixed with a conclusion of law] may be valid as a general principle of contract law [*Smith v. Githens,* 271 S.W.2d 374, 378[2–6] (Mo.App.1954) ] but even that rule that one, able to read and understand, is bound by the signature—whether he has actually read—is tempered where the relation of trust and confidence subsists between the drafter and the signatory. Restatement (Second) of Contracts § 161(d); comment *f* (1981).

transfer of shares by the persons designated as minority stockholders who later became inactive, was distracted by a divided loyalty induced by his own interest as a designated minority shareholder, is manifest by his insistent testimony that he prepared the stockholders agreement, not to protect the corporation, but "to protect the original subscribing shareholders of the company."

The presumption is against the propriety of such a transaction, and the good faith of the attorney does not bear to dispel that predisposition. *Demmel v. Hammett,* 360 Mo. 737, 230 S.W.2d 686, 689[1–4] (1950). The scrutiny by the court of such a transaction can be satisfied only by clear proof by the attorney his adverse interest was fully disclosed to the client and perfectly understood. *Morton v. Forsee,* 249 Mo. 409, 155 S.W. 765, 775[3] (banc 1913); 7A C.J.S., Attorney & Client § 236 et seq. (1980). The evidence fails that necessary proof.

The plaintiff Shaffer contends, nevertheless, that Terrydale is precluded by principles of collateral estoppel to assert a construction of the stockholders agreement other than as declared by the trial court. Shaffer argues that the declaratory judgment adjudicated that *neither* Shaffer *nor* Burrus was under *employment* by the corporation within the stockholders agreement so that *neither* was under an enforced option by Terrydale to redeem the owned shares—that Terrydale appeals only from the judgment in favor of Shaffer—therefore the declaration in favor of Burrus has since become final and now estops Terrydale from litigation anew of that issue.

The principle of collateral estoppel does not apply for several reasons.

Restatement (Second) of Judgments § 68 (Tent. Draft No. 4, 1977) defines the principle:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is *conclusive in a subsequent action* between the parties, whether on the same or different claim. [emphasis added]

Our decisions adopt that essential formula: "collateral estoppel [issue preclusion] preclude[s] the same parties from *relitigating* issues which had been 'previously adjudicated." *Oates v. Safeco Ins. Co. of America,* 583 S.W.2d 713, 719[8] (Mo. banc 1979). An appeal, however, is not a *subsequent action* within the rule of issue preclusion, but a continuation of the original jurisdiction and suit, just another step in the orderly adjudication of the cause of action. *State ex rel. Board of Registration For the Healing Arts v. Elliott,* 387 S.W.2d 489, 492[2, 3] (Mo. banc 1965); *Herhalser v. Herhalser,* 401 S.W.2d 187, 193[9–11] (Mo.App.1966). The objective of the issue preclusion doctrine is to relieve the parties from the cost and vexation of multiple litigations, to conserve judicial resources and to encourage reliance on adjudication by avoidance of inconsistent decisions [*Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980)]—and not to subvert appeals.

The principle of issue preclusion [collateral estoppel] does not apply in any event [Restatement (Second) of Judgments § 68.1(d), Exceptions to the General Rule of Issue Preclusion (Tent. Draft No. 4, 1977)] where:

> The party against whom preclusion is sought had a significantly heavier burden of persuasion with respect to the issue in the initial action than in the subsequent action; *the burden has shifted to his adversary;* or *the adversary has a significantly heavier burden than he had in the first action.* [emphasis added]

If the preclusion principle were otherwise applicable [an assumption only hypothetical], the Burrus adjudication does not estop Gramlich-Terrydale from an assertion of right under the stockholders agreement contrary to a determination already in favor of Burrus because the risk of nonpersuasion allocated to Shaffer was more onerous than Burrus was required to discharge. The contention between Burrus and Gramlich-Terrydale was as signatories to the stockholders agreement—contractors at arm's length. The contention between

Shaffer and Gramlich-Terrydale was a claim by an attorney against the client for a benefit based on the subject-matter of the representation—a claim by a fiduciary against a cestui que trust. In a declaratory judgment action the burden of proof rests, as in the usual course, on the party who asserts the issue according to the cause of action. *State Farm Mutual Auto Ins. Co. v. Johnson,* 586 S.W.2d 47, 51[6] (Mo.App. 1979). Thus, the risk of nonpersuasion was on Terrydale to prove by a preponderance of the evidence that the corporation was entitled to the option to purchase the shares of Burrus [and Shaffer] under the settlement agreement as persons under employment by Terrydale but whose employment was terminated. The risk of nonpersuasion as to the Terrydale contention against Shaffer, however, was on Shaffer—and that to prove the utter propriety of the transaction—once fiduciary relationship between them was shown. *In re Conrad,* 340 Mo. 582, 105 S.W.2d 1, 10[4–9] (banc 1937). Accordingly, principles of issue preclusion do not estop Terrydale from the continued litigation of the *employment* and *terminates employment* terminology of the agreement even though the Burrus judgment [so the assumption goes] adjudicates that issue against Terrydale. Restatement (Second) of Judgments § 68.1(d) (Tent. Draft No. 4, 1977).

The collateral estoppel argument rests on an even more fundamental error. A judgment is the final determination of the rights of the parties in the action. Rule 74.01. The conclusions of law found that neither Burrus nor Shaffer was under employment by Terrydale nor was terminated by Terrydale. The judgment directed the corporation to reinstate both Burrus and Shaffer as owners of 50 shares each of Terrydale stock. The court adjudged further, however, "that as a result of the death of Burrus, Terrydale has the right to exercise the option [under the stockholders agreement] to purchase his shares." The parties agree that *both* Burrus and Shaffer were subject to the *dies* contingency of the agreement, and in fact Terrydale since the judgment redeemed the Burrus shares un-der the contract option. The right finally determined—in terms of Rule 74.01, the *judgment*—between Burrus and Terrydale was not, as the collateral estoppel argument promises, the construction of the *employment* terminology of the agreement, but enforcement of the *dies* contingency of that document. That the *employment* construction became moot as to Burrus upon his death is evidence from the judgment itself. Terrydale received the full relief sought from Burrus: the right to enforce the purchase of the 50 owned shares. Terrydale was not aggrieved by the judgment as to Burrus and so was without right of appeal as to that party. § 512.020, RSMo 1978; *In re Marriage of Kinnick,* 621 S.W.2d 104, 105[1–4] (Mo.App.1981). It follows that the neglect to join Burrus on appeal—even if valid in principle—does not estop the appeal as to the party Shaffer.

The judgment of the trial court is reversed. We enter declaration of judgment that lawyer Shaffer was under *employment* by Terrydale and that the *employment terminated* under the terms of the stockholders agreement when Shaffer was no longer actively engaged in the corporation business, and that Terrydale (as of February 25, 1980) is entitled to exercise the option to purchase those 50 owned shares in the manner provided in the agreement.

All concur.